[No. 23859.  *En Banc.*  August 5, 1932.]

HUGO GLASER, *Respondent*, v. JOHN KATALINICH *et al.,*
*Appellants.*

[1]Reported in 13 P. (2d) 468.

*Charles T. Peterson* and *Joe Woods,* for appellants.
*Geo. P. Fishburne* and *George O. Swasey,* for respondent.
*Pearson & Potts, Amicus Curiae.*

PARKER, J.—The plaintiff, Glaser, commenced this action in the superior court for Pierce county seeking recovery of damages from the defendants, Katalinich, Beritich and Gamulin, copartners, as owners of the fishing boat Christine, for personal injuries suffered by him as the result of the alleged negligent operation of the boat while he was employed thereon as a member of its crew while it was engaged in purse seine fishing in the Pacific Ocean, off Cape Flattery. Trial upon the merits in that court, sitting with a jury, resulted in verdict and judgment awarding to the plaintiff recovery against the defendants, from which they have appealed to this court.

During the year 1931, the Christine was owned by the defendants as copartners. It was sixty-seven feet long, sixteen feet wide, and propelled by a ninety horsepower oil-burning engine. During the fishing season of that year, from May to September, inclusive, it was engaged in purse seine fishing in the Pacific Ocean and elsewhere in the waters of this state. During that period, it was manned by a crew of nine men, including the captain and the engineer, the plaintiff being one of the seamen thereon. It was equipped with a purse seine some eighteen hundred feet long, which was owned by the captain and engineer as copartners.

The boat and seine were, during that season, operated on a lay or shares plan; that is, the earnings of

the boat and seine during the season were to be divided into thirteen shares; the defendants as partnership owners of the boat to have two shares; the captain and engineer as partnership owners of the net to have two shares; the captain as one of the crew to have one share; the engineer as one of the crew to have one share, and each of the other seven members of the crew, including the plaintiff, to have one share.

Maintenance and repair of the boat, apart from its actual operation, were to be made by the defendants, its owners, at their own expense. Such repairs were made by the defendants even at times when the boat was at sea, though none of them worked upon the boat in its fishing operations. This was, in effect, at the beginning of the season, a two-party agreement between the partnership owners of the boat and the partnership owners of the net. It was then further agreed between them that Pete Jugovich, one of the owners of the net, should be the captain of the boat during the season. This made him the general manager of the fishing venture for the season, with power to employ eight additional members of the crew, including an engineer.

The captain then employed John Stambuk, the other owner of the net, as engineer for the season. Thus, Stambuk became a member of the crew, entitled to one share of the net profits as such. The captain then employed the other seven members of the crew, including the plaintiff, for the season. This was done orally, apparently in a very informal manner, but evidently in accordance with the usual custom of employing fishing crews for fishing ventures such as was contemplated. We have in the record almost nothing of the actual words passing between the captain and any member of the crew so employed by him, so we quote the testi-

mony of the plaintiff, Glaser, as showing his interpretation of the contract under which he became a member of the crew, as follows:

"Mr. Fishburne [counsel for plaintiff]: Q. Were you a member of the crew on the boat Christine? A. Yes, sir. Q. Who hired you? A. The captain of the Christine, Mr. Pete Jugovich. Q. How were you to be paid? A. I was to be paid in the old customary way which is this way, the catch of the fish was to be divided into thirteen shares, and I was to get one share. Q. Before you got your share, what expenses were to be deducted? A. They deducted the board and also the fuel we used for running the boat. Q. How was that board divided? A. The board was divided into nine shares, the owner of the boat and the nets didn't have to pay for the board. Q. How about the oil? A. Everybody pays for the oil, owners of the boat and net and crew. Q. If you didn't make anything, what expenses, if any, do you have to pay? A. I have to pay for my board. Q. What else? A. For the fuel—board and fuel. Q. How would they get that out of you? A. If I had the cash, I would pay cash; if I didn't have cash, why, the next year when I go out fishing again they deduct from my share. Q. Did you have to bear any other expenses than that? A. No, that is all I know of. Q. If the net was lost, who bore that loss? A. The owner of the net. Q. If the boat went down, was that charged against the crew? A. No. Q. Whose loss was it? A. The owner of the boat. Q. Who gave orders on that boat? A. Captain Pete Jugovich. Q. Did the captain have the power to fire you? A. Absolutely. Q. State whether or not it was in May, 1931, that Pete Jugovich hired you. A. It was sometime in May when he hired me. Q. If they didn't have any luck and you had a loss and could not pay the oil bill, why then that loss was a loss that everybody stood together? A. It very seldom, if ever, happens. Q. You always, of course, caught some fish? A. Yes, sir. Q. But if it did happen that you should not catch any fish and did have a loss, then you would take your part of the loss? A. Just for grub and oil, nothing else."

The other evidence is in full harmony with this testimony of the plaintiff as to the employing of the seamen.

When a haul was to be made, the plaintiff's assigned duty was to get off the boat into a skiff, to which would be attached the line of the end of the seine which was to first leave the boat. The plaintiff was then to pull away from the boat and hold the skiff stationary with the oars while the boat would circle around a school of fish, the seine falling from the boat as it circled around to the plaintiff in the skiff, when he would throw the line of his end of the seine to a man on the boat when the hauling in of the seine would proceed.

On August 1, 1931, while the crew was so engaged in making a haul off Cape Flattery, the plaintiff was injured. The accident occurred just as he was throwing or about to throw the line of his end of the seine from the skiff to the man on the boat; and, as he claims, was caused by the boat being negligently navigated by the captain, in that it was driven directly towards him in the skiff at almost full speed, striking the skiff broadside, upsetting it and throwing him into the water, causing him to come in violent contact with some portion of the skiff or the boat, and thereby being severely injured, and also causing him to be entangled in the net or line and be drawn under the water and almost drowned.

There was ample evidence to warrant the jury in concluding that the captain negligently navigated the boat on its approach to the skiff, and thus caused the plaintiff to be injured. There was some evidence tending to show that the clutch of the engine was given to slipping so that the engineer could not stop the boat quickly. This evidence, however, was of little or no consequence touching any question of the seaworthi-

ness of the boat, but was of some consequence touching the captain's negligent navigation of the boat at excessive speed in approaching the skiff in which the plaintiff was waiting to throw the seine line to the seaman on the boat.

The principal contention here made in behalf of the defendants, to which their counsel have devoted their most extended argument, is that the trial court erred in refusing to take the case from the jury and decide as a matter of law that the evidence was not sufficient to support any award of damages against them. As we understand their counsel, they make these two arguments in support of this general contention: first, that this fishing venture was not such a joint venture as between them and the captain, that they were in any degree responsible or liable for his negligent navigation of the boat; and, second, that, even if they were liable, speaking generally, for the captain's negligent navigation of the boat, as co-adventurers with him, they were not liable to the plaintiff as one of its crew because he was one of the co-adventurers in the fishing venture.

Our late decision in *Domandich v. Doratich,* 165 Wash. 315, 5 P. (2d) 310, comes very near, if not quite, answering the first of these arguments. It does not appear in that opinion just how exclusive the control and care of the boat was in the captain, but, evidently, he had at least as much control and care of that boat as the captain had of this boat. Here, it is plain that the defendants, the owners of the boat, assumed the keeping of it in repair and actually made repairs of it during the fishing season, even while it was at sea. We are of the opinion that the defendants, as owners of the boat, were liable as the captain would be liable for his negligent navigation of the boat resulting in the injury to the plaintiff.

Our decision in *Domandich v. Doratich,* 165 Wash. 315, 5 P. (2d) 310, also comes near answering the second of these arguments. The only difference we see in the facts is that the plaintiff seaman in that case "was not required to share in the losses, if any," while this plaintiff seaman was to share in losses in so far as the proceeds of the catch failed to equal the expense incurred for oil for the engine and food for the crew. This does suggest a more nearly complete, conventional joint adventure between the plaintiff and the others, including the owner and the captain, than is suggested by the facts of that case.

But we are to remember that whatever may be said as to this being a joint venture, the fact remains that it was not a joint venture as to the control of the prosecution of the venture in so far as the plaintiff and the other seamen were concerned. None of them had any voice in the control as to where the fishing would be done, as to the labor they were to perform, or even as to the manner of the performance of their labor. All of this was subject to the orders of the captain, which each seaman was bound to obey. While they were to be paid, prospectively, from the profits of the season's catch, with a bare possibility of having to bear some actual loss, they were none the less without voice or control in the actual prosecution of the venture. They were still mere seamen subject to the orders of the captain to the same extent as if they had been employed at a fixed wage, payable regardless of the profits of the venture.

We are of the opinion, not only that the captain's negligence was properly decided by the jury as the proximate cause of the plaintiff's injuries, but that the jury manifestly having so decided, the defendants, as owners of the boat, must be held liable as the captain would have been held liable had he been sued as a

party to this action for the injuries suffered by the plaintiff.

It is contended in behalf of the defendants that the court erred to their prejudice in permitting one of the seamen, present at the time of the accident, to testify to a conversation between himself, the engineer and the captain. The part of his testimony which we regard as coming most nearly to being objectionable is:

"Right after the accident was all over I yelled to the skipper—in fact during the accident—I yelled that the engine did not back up as it usually does back up;"

this, manifestly, having reference to the stopping of the boat immediately following the giving of the signal therefor by the captain to the engineer. This was, we think, a spontaneous expression so clearly connected with the accident, both as to time and the then present conditions, as to constitute a part of the *res gestae,* and was admissible under the *res gestae* rule, though the trial court seemed to have been of the opinion that it was admissible upon other grounds and not under the *res gestae* rule.

It is further contended in behalf of the defendants that the trial court erred to their prejudice in permitting another seaman to testify:

"Q. State what the trouble was with the clutch. A. Well, the only thing is that the engineer was complaining all the time that the clutch is awful stiff, and that he had to use his leg and both hands and then sometimes the clutch slipped back on him."

There may be some ground for arguing that, technically, this constituted error, but, under the circumstances, we think that it was not such error as to call for a new trial; especially in view of the fact, as we read this record, that there was no serious contention that the accident was the result of any substantial degree of unseaworthiness of the vessel by reason of the

condition of the clutch. The engineer had testified that the clutch was all right, under ordinary conditions, for stopping the boat. This had no substantial bearing on the controversy other than as bearing upon the negligent navigation of the boat by the captain, particularly in his not timely signalling to the engineer.

It is further contended in behalf of the defendants that the court erred to their prejudice in giving to the jury the following instruction touching the manner in which they should consider certain mortality tables, the admission of which was not objected to, as follows:

"Certain Expectation of Life Tables have been admitted in evidence for purpose of showing the number of years a man of plaintiff's age may expect to live. If you believe from the testimonies that the plaintiff has been permanently injured then you may refer to these tables to ascertain the number of years which a man of plaintiff's age may be expected to live. Then ascertain from the other evidence in the case what was plaintiff's earning capacity for one year at the time of the injury complained of, and if you find that his earning capacity has been reduced on account of the said injury, calculate the difference between his earning capacity before and after the injury and multiply this difference by the number of years of plaintiff's expectancy. This sum is not conclusive. It is to be considered by you in connection with other testimony to arrive at the amount of plaintiff's damages, if any. You may consider in connection with the evidence the fact that plaintiff's declining years during the time of his expectancy and his diminished capacity for earning money by reason thereof, his liability to sickness and the probability of his earning capacity being diminished by other causes during such time. And on the other hand, you may consider whether or not the capacity of plaintiff may be increased by his greater experience in his occupations during such time. All these circumstances may be considered by you in arriving at

what you would determine to be the proper amount of damages.''

It does seem that this instruction was unnecessarily long and involved. However, read as a whole, we are unable to see that it would give to the jury an understanding that they were to view the tables improperly. The qualifications and limitations therein stated, we think, were sufficient to prevent the jury being misguided.

We do not see anything prejudicial to the rights of the defendants in other claims of error calling for further discussion.

The judgment is affirmed.

MAIN, MITCHELL, HERMAN, and MILLARD, JJ., concur.

BEALS, J., dissents.

HOLCOMB, J. (dissenting)—In my opinion these parties were engaged in a purely joint venture. The orders of the captain were those of a joint venturer and not those of a master to a seaman-employee. Respondent, therefore, should not recover.

TOLMAN, C. J. (dissenting)—I dissent.

In my judgment the principal error, and probably the only error embodied in the majority opinion, is the approval of the instruction given as to the effect and force of mortality tables. The first part of the instruction quoted by the majority in plain terms tells the jury that the tables are admitted in evidence for the purpose of showing the number of years that a man of plaintiff's age may expect to live, and if they believe him to have been permanently injured, then they may refer to these tables for the purpose of determining the probable duration of plaintiff's life. This is in effect to tell the jury that the mortality tables deter-

mine the number of years that the plaintiff would live. Such is not the law. Mortality tables are but averages based upon selected lives, showing the results of human experience. They are at most but a guide in determining the probable continuance of the life of any particular person, and the jury should have been told that these tables were not conclusive in any respect, but merely presented the law of averages, and that plaintiff's life expectancy should be determined by considering these tables in connection with what the evidence might show as to plaintiff's general health, the hazardous or nonhazardous nature of his occupation and all other like evidence tending in any wise to indicate his life expectancy. The mere inclusion of the words, "This sum is not conclusive," relates only to the matter of computation, and does not relate back to the life expectancy with sufficient clarity to properly advise the jury as to its duties. I therefore dissent by reason of the giving of this instruction alone.