[No. 30239. Department Two. November 6, 1947.]

MARTIN SKRIVANICH et al., Appellants, v. JOHN D. DAVIS, as Commissioner of Unemployment Compensation and Placement, Respondent.[1]

[1] Reported in 186 P. (2d) 364.

R. W. *Greene* and *Neal, Bonneville & Hughes,* for appellants.

*The Attorney General* and *William J. Millard, Jr., Assistant,* for respondent.

*Houghton, Cluck & Coughlin* and *Edward E. Henry, amici curiae.*

STEINERT, J.—This is an appeal from a judgment of the superior court for Pierce county, affirming a decision rendered by the commissioner of unemployment compensation and placement after a consolidated hearing of two separate proceedings, in which decision the commissioner made two rulings: (1) He denied a claim made by the owners of a fishing vessel for refund of contributions previously paid by them into the unemployment compensation fund of this state; and (2) he held the owners of another fishing vessel liable for unpaid assessments for contributions to that fund. The owners of the two vessels prosecute this appeal jointly, contending that they are not liable for such contributions.

The material facts are undisputed and may be stated as follows: Appellants Martin Skrivanich and Ralph Shulich are co-owners of a purse seine fishing vessel, known as the "Oregonian," and its equipment. The vessel is valued at twenty-five thousand dollars and its gear and seine at forty-

five hundred dollars. During the season of 1945, which is the only period of time immediately involved in this action, the crew consisted of nine men, including Skrivanich, who acted as captain, and Shulich, who worked as an ordinary crew member.

Appellants Marko Gazija and Sam Gazija are co-owners of a purse seine fishing vessel, known as the "Louis G," and its equipment. The vessel in 1936 cost ninety-three hundred dollars and its gear and seine fifteen hundred dollars. Appellants estimate the present value of the boat to be between twenty-five thousand and thirty thousand dollars and that of the gear and seine to be five thousand dollars. During the season of 1945, it was operated with a crew of eight men, including Marko Gazija, acting as captain, and Sam Gazija, working as an ordinary crew member.

During the season in question and for years prior thereto, these two vessels were engaged in salmon fishing expeditions in the Puget Sound area, and these operations have always been conducted in accordance with well-known universal customs governing the fishing industry and in pursuance of working agreements between the owners of these vessels and the United Fishermen's Union of the Pacific, Puget Sound District, a union to which all of the instant crew members other than the captains belonged. Further reference to these customs and working agreements will be made as we proceed.

Fishing craft of the kind here involved customarily have a crew of eight or nine men, including the captain, and operate on what is known as the "lay," or "share," plan; that is, remuneration to the owners of the boat and equipment and also to the crew members, is based upon and paid on a predetermined share basis from the earnings of the season's catch, after deduction of certain specified expenses.

At the beginning of the season, the owner or operator of the boat selects and engages the members of his crew. The contracts under which the crew members are engaged are entirely informal, it being the usual practice for the fisherman to approach the owner or operator of the boat and ask

for a "chance" on the season's expedition, and, if the applicant's services are desired, he is then and there engaged for the full season without further discussion as to the terms of employment and remuneration, inasmuch as both the parties are fully conversant with the conditions pertaining to such agreements.

The members of a crew who have thus been engaged perform the regular duties incident to the catching of the fish and, in addition thereto, are required to render services, without additional compensation, in readying the gear and net before the commencement of the expedition, assisting in the repair of that equipment if it be damaged while fishing, and finally preparing it for storage at the end of the season; the owner of the boat bears the cost of all repairs to the vessel itself.

The actual fishing operation is directed by the captain of the boat. He determines the date of departure upon the expedition, the site of the fishing operations, all movements of the vessel, the place and manner of lowering the net, and the cannery to which the fish are to be delivered and sold. The labor performed by the members of the crew is subject to the orders of the captain, which each crew member is bound to obey. The minimum price to be paid for the fish is, however, determined and fixed by negotiations between the union and the various canneries; boat owners and captains do not participate in such negotiations.

The captain may discharge a member of the crew for cause, but otherwise is required to have the consent of the crew or its agency, the union. Under the working agreements between the boat owners or operators and the union, the crew has considerable voice in determining what food and medical supplies are to be carried on the boat; they can compel delivery of the fish, when caught, to a union tender and sale thereof at minimum prices set by the union; they can prevent the owner or captain from employing more than a normal number of crew men except with their consent; they can compel the captain to discharge a man who is unqualified for work; and they have the right to be present

or represented when the fish are counted and to examine all accounts and bills relating to expenses incurred. Each crew member has the right to quit at any time, but is required by the union agreement to give forty-eight hours' notice.

During the fishing operation, the daily catch is generally unloaded into fish tenders owned and operated by fish canneries, thus relieving the fishing vessel from the necessity of returning to shore to make delivery of the catch. It is the usual practice for the captain and a member of the crew to count the fish as they are transferred from the boat to the tender, and then, after the fish have been weighed, the party in charge of the cannery tender gives the captain of the fishing vessel a receipt commonly called a "fish ticket," containing a statement of the weight, species, and price per pound of the fish. These tickets are sometimes made out in the name of the master of the vessel, and sometimes in the name of the vessel itself.

At the end of the season and upon presentation, the fish tickets are exchanged for the cannery's check made payable to the boat or its owner. The check is immediately cashed, and the proceeds are divided in the following manner: From the gross amount, there is deducted the expense of gasoline, oil, fuel, and ice used in or during the operation of the vessel. The balance is divided into twelve or thirteen shares (depending upon whether the crew consists of eight or nine men); two shares are paid to the owner of the boat, two to the owner of the gear and net (if the boat and equipment are owned by the same party, then such party receives four shares), and one share to each of the crew, including the captain. From the eight or nine shares allotted to the crew, the expense of all food consumed and the cost of replacement of broken or damaged kitchen utensils during the fishing season are deducted, each member bearing his proportionate part thereof.

In the event the expedition fails to net a sufficient return to cover the expenses, which is seldom the case, each crew member is morally liable to the owner of the boat for his

proportionate share of the deficit, commonly called a "hole bill." If nothing remains of the earnings after the payment of the expenses referred to above, neither the owner nor the crew receives anything for their respective investments or services. Should a cannery or fish buyer fail to pay for fish delivered, and, because of bankruptcy or insolvency, the account is uncollectible, it is understood that the crew members have no recourse against the owner for their share of the earnings, but themselves sustain the loss to the extent of their proportionate shares. Such an event, however, rarely ever presents itself.

If, by reason of injury or sickness, a member of the crew is unable to finish the season, it is the practice to give him a share of the earnings nevertheless, although this is considered a moral rather than a legal obligation.

In the instant case, appellants deducted from the shares of the crew members the Federal income withholding tax and the social security tax of one per cent. The Gazija brothers also carried employers' liability insurance.

Upon this state of facts as shown by the evidence, the appeal tribunal of the office of unemployment compensation and placement rendered its decision holding the appellants liable for contributions to the unemployment compensation fund. On appeal to the commissioner, that decision was affirmed, and, on further appeal to the superior court, was again affirmed.

The sole question presented upon the appeal to this court is whether appellants are "employers" within the meaning of the provisions of chapter 35, p. 76, Laws of 1945 (Rem. Supp. 1945, § 9998-140 *et seq.*), and therefore liable for unemployment compensation contributions by reason of the "shares" paid by them to their crew members. The same question is presented by appellants' form of statement, namely, whether the crew members are persons in appellants' "employment," within the purview of that legislative act.

For convenient reference, we here and now quote the material provisions of the 1945 act applicable to, or necessary to be considered in, the situation presented by this case.

"Sec. 9. *Employer*. 'Employer' means any individual or type of organization, including any partnership . . . having any person in employment . . ." (Rem. Supp. 1945, § 9998-148)

"Sec. 11. *Employment*. 'Employment,' subject only to the other provisions of this act, means personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, including service in interstate commerce, performed for wages or under any contract calling for the performance of personal services, written or oral, express or implied. . . ." (Rem. Supp. 1945, § 9998-150)

"Sec. 15. *Exception Tests*. Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commissioner that

"(a) such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(b) such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(c) such individual is customarily engaged in an independently established trade, occupation, profession, or business, of the same nature as that involved in the contract of service." (Rem. Supp. 1945, § 9998-154)

"Sec. 33. *Wages*. 'Wages' means the first three thousand dollars of remuneration paid by one employer to an individual in its employment for services performed during one calendar year.

"'Remuneration' means all compensation paid for personal services, including commissions and bonuses and the cash value of all compensation paid in any medium other than cash. . . ." (Rem. Supp. 1945, § 9998-171)

By express provisions contained in §§ 16 to 28 of the act (Rem. Supp. 1945, §§ 9998-155 to 9998-166), the term "employment" does not include services in certain specified kinds of activity, such as agricultural labor, domestic service, family employment, eleemosynary services, governmental service, newsboys' services, casual labor, etc.

The solution of the problem presented to us in the instant case hinges upon the term "employment" as defined in § 11 of the legislative act (Rem. Supp. 1945, § 9998-150), quoted above.

It is the contention of the appellants that there was no "employment" in this instance, within the purview of the statute, because (1) no *wages* or remuneration was ever paid by the appellants, as employers, to the members of the crew, as employees, and (2) under the evidence, the relationship between the appellants and the members of the crew was, or approximated, that of joint adventure rather than that of master and servant.

 In considering whether or not one is "in employment," within the scope and meaning of the present unemployment compensation act, the first question to be determined is whether such individual is performing personal services, of whatever nature, for wages or under any contract calling for the performance of such services. If that question be answered in the negative, then the person is not "in employment" under the act. If, on the other hand, that question be answered in the affirmative, then such person is "in employment" under the act, unless excluded from its operation by the application of the exception tests prescribed by § 9998-154, or unless the nature of his services is of the kind specifically excluded from coverage by the act under §§ 9998-155 to 9998-166. Authority for considering and determining this initial question in the manner and order above indicated is found in *Broderick, Inc. v. Riley*, 22 Wn. (2d) 760, 157 P. (2d) 954.

That case was based upon the unemployment compensation act of 1937 as amended in subsequent years up to and including 1943. Under that act as it appears in Rem. Supp. 1943, § 9998-103a [P.P.C. § 923-5] *et seq.*, employment was defined as follows:

" 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or *under any contract of hire*, written or oral, express or implied." (Rem. Supp. 1943, § 9998-119g(1) [P.P.C. § 928-37]) (Italics ours.)

The exception tests provided in that act, under Rem. Supp. 1943, § 9998-119g(5), were the same as those prescribed by the 1945 act in Rem. Supp. 1945, § 9998-154.

In the *Broderick* case, *supra,* the court said that:

"In making the initial determination of whether or not one is in employment under the act, the first question to be determined is whether, under the facts, such one performed personal services for another for wages, or remuneration, or under a contract of hire. Such a contract of hire contemplates a relationship whereby the employee furnishes personal services to his employer for wages or remuneration to be paid by such employer. If this question be answered in the affirmative, then under the act such one is in employment. If this question be answered in the negative, such one is not in employment under the act. If the question be answered in the negative, then Rem. Supp. 1943, § 9998-119g(5), has no application and is not to be considered. If the question is answered in the affirmative, then such person is in employment under the act unless excluded from its operation by reason of having met the tests prescribed by § 9998-119g(5)."

 It is to be noted that in the 1943 act, under which the *Broderick* case, *supra,* arose, employment meant service "performed for wages or under any contract of hire" suggesting by that phraseology alone a relationship of master and servant; whereas, in the 1945 act, upon which the instant case rests, the term "employment" is defined as meaning

". . . personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, . . . performed for wages or under any contract calling for the performance of personal services."

It is apparent that the 1945 legislature intended and deliberately concluded to extend the coverage of the 1943 unemployment compensation act and, by express language, to preclude any construction that might limit the operation of the act to the relationship of master and servant as known to the common law or any other legal relationship. In doing this, the legislature simply expressed in more definite and concrete form what this court had on many previous occa-

sions already held. In *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89, appears this statement:

"We have upon a number of occasions held that our unemployment compensation act does not confine taxable employment to the relationship of master and servant, but brings within its purview many individuals who would otherwise have been excluded under common-law concepts of master and servant, or principal and agent. *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568; *Mulhausen v. Bates, supra* [9 Wn. (2d) 264, 114 P. (2d) 995]; *In re Foy, supra* [10 Wn. (2d) 317, 116 P. (2d) 545]; *Sound Cities Gas & Oil v. Ryan,* 13 Wn. (2d) 457, 125 P. (2d) 246; *In re Hillman Inv. Co., supra* [15 Wn. (2d) 452, 131 P. (2d) 160]."

To the same effect, see *Mulhausen v. Riley,* 22 Wn. (2d) 811, 157 P. (2d) 938; *Unemployment Compensation Department v. Hunt,* 22 Wn. (2d) 897, 158 P. (2d) 98.

Reverting, then, to the question to be first determined, we are to inquire whether the members of the crews performed personal services of any nature whatever for wages or under contracts calling for the performance of such services, written or oral, express or implied.

It is conceded by appellants that a contractual relationship existed between themselves and the members of their respective crews, although such contracts admittedly were very informal, arising through oral agreement and based partly upon well-established customs understood and accepted by all parties concerned therewith. It is also undisputed that the crew members performed personal services and received remuneration therefor.

Appellants contend, however, that the services of the crews were not performed *for the appellants,* and that no wages or remuneration was ever paid to the crew members out of *funds belonging to the appellants.* In other words, the contention in its final analysis is that the services of the crews were performed under a joint venture between appellants and their crews, and that the remuneration to the crews was simply a proportionate share of an existing joint property in the fish and the proceeds derived therefrom.

With regard to this contention, we note parenthetically (1) that the sections of the 1945 statute defining employer and employment (Rem. Supp. 1945, §§ 9998-148, 9998-150) do not expressly require that the services be performed *for* the employer, but refer simply, though broadly, to a relationship wherein any individual or type of organization has in his or its employ any person engaged in performing personal services; (2) that the statute does not require that the wages or remuneration be paid out of funds belonging to the employer; (3) that the statute includes not only services performed for *wages,* but also services performed "under any contract calling for the performance of personal services"; and (4) that the statute specifically provides that the services may be of any nature whatever, unlimited by the relationship of master and servant or any other legal relationship.

However, for the purposes of this case, we will assume that the statute contemplates that the services must be performed for the person designated as the employer, and that the wages or remuneration paid to the employee must come from funds belonging to the employer. By this assumption, however, we do not concede that the relationship between appellants and the crews in this instance was that of joint adventure.

In our opinion, the services which the fishermen performed under the contracts were clearly *for* the appellants or for their benefit. As owners of the fishing vessels, gear, and nets, the appellants determined upon and arranged for the fishing expeditions. Having the equipment, it was necessary for them to employ men who would perform the required services in order to make the expedition successful. With this in view, they selected men of their own choice to serve as members of the crew, to do certain things required to be done upon the voyage, and the men accepted the employment and performed the services with that understanding. Everything the members of the crew did was under the direction of the captain or master of the vessel, and was done for the benefit of the owners of the vessel prosecuting their own established business.

In defining the terms "service" and "personal service" as used in the Utah unemployment compensation act, the supreme court of that state, in the case of *Creameries of America v. Industrial Comm.*, 98 Utah 571, 102 P. (2d) 300, said:

"In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed. The general definition of 'service' as given in Webster's New International Dictionary is 'performance of labor for the benefit of another'; 'Act or instance of helping, or benefiting.' The term 'personal service' indicates that the 'act' done for the benefit of another is done *personally* by a particular individual."

So, in the case at bar, the duties performed by the various members of the crews constituted personal services performed for the benefit of the boat owners, thereby falling within the term "employment" as used in the unemployment compensation act.

We are of the further opinion that, under the evidence and the legal authorities bearing upon the subject, the remuneration received by the crew members constituted "wages" and was paid out of funds belonging to the owners of the fishing vessels.

The basis upon which the members of the crews were compensated and the procedure under which they were paid their remuneration, have already been explained. They were each paid a share of the net earnings after the deduction of certain expenses. This method has been followed generally from time immemorial, and, in this state, from early days. It has always been regarded as a method of providing for the payment of *wages*.

In *United States v. Laflin*, 24 F. (2d) 683, the circuit court of appeals for the ninth circuit said:

"It has been the maritime law from the time of Oleron that agreements, by which seamen, engaged in a fishing or whaling voyage, are to receive for their services shares of the profits of the voyage, are contracts of hiring, and the

shares so agreed upon are in the nature of wages, to recover which actions may be maintained after the end of the voyage. [Citing cases.]"

and again:

"It is well settled by the decisions that in whaling ventures the sailors who have a certain lay or share in the proceeds as wages are never regarded as partners with the owners, though they may participate in the profits of the voyage; and it is equally well settled that neither the officers nor members of the crew may join with the owners in a recovery of the proceeds of the voyage, and that the owners of the vessel and projectors of the voyage are the owners of the products thereof."

Cases to the same effect will be found collected in Notes (1942), 137 A. L. R. 159 (k).

Although, under their contracts, the members of the respective crews were and are entitled to receive a share of the profits, such shares are not to be regarded as a specific interest in a business or in the profits thereof, but rather as a stipulated proportion of the proceeds as compensation for their labor or services. The distinction between profits received "as profits," and profits received in payment of an obligation, is fully and well explained in *Sheldon v. Little,* 111 Vt. 301, 15 A. (2d) 574, 137 A. L. R. 1.

In our opinion, the fish when caught and the proceeds thereof when the fish were sold belonged to the owners of the boats, who became obligated to pay to the members of the crews their respective shares as and when the proceeds were collected.

As indicated above, appellants' ultimate contention in this case is that the relationship between them and the members of their respective crews was that of joint adventure, rather than that of master and servant. While the statute above quoted does not limit its coverage to the relationship of master and servant as known to the common law or any other legal relationship, it is our considered opinion that, under the evidence in this case and the decisions bearing on the subject, the relationship was in fact and in law one of master and servant, and not one of joint

adventure. We say this for several reasons: (1) because, as stated above, we hold that the remuneration received by the crew members constituted wages, not profits as such, thus indicating an employment for hire; (2) because the facts taken as a whole are more nearly consistent with the relationship of master and servant than with that of joint adventure; and (3) because of the decisions from this court and elsewhere bearing upon the subject. The first of these reasons needs no further discussion. The second reason calls for a little more extended statement.

■■ While there is no single test by which to distinguish the relationship of master and servant from that of joint adventure, it is generally agreed that the test of the relationship of master and servant, or employer and employee, is the right of control on the part of the employer. *Carlson v. Collier & Son Corp.,* 190 Wash. 301, 67 P. (2d) 842; *Carmin v. Port of Seattle,* 10 Wn. (2d) 139, 116 P. (2d) 338. On the other hand, it is equally agreed that one of the most important tests of a joint adventure or partnership is whether the parties share the losses. *Miles Co. v. Gordon,* 8 Wash. 442, 36 Pac. 265; *Gottlieb Brothers v. Culbertson's,* 152 Wash. 205, 277 Pac. 447.

On the question of control, we note the following: Appellants were the sole owners of the boats and all the equipment, valued at many thousands of dollars; they devoted these vessels to a fishing enterprise; they hired whom they pleased for the conduct of the fishing operations and they had the right, under their working agreements with the fishermen's union, to discharge the members of the crews at any time for cause; they had complete supervision of all the instrumentalities; they determined when and where the vessels should sail; they had complete charge of the fishing operations, directing when, where, and how the instrumentalities should be used; and they sold the fish to whatever cannery they wished. In short, they exercised the sole right of management and conduct of the undertaking and sole authority in directing the use and manner of use of the instrumentalities and equipment employed in the enterprise. They apparently considered themselves to be

employers, for they deducted from the shares of the crew members the Federal withholding tax and social security tax.

With reference to the matter of losses, these were not in a true sense shared by the members of the crews. Had the vessels or gear and nets been lost or damaged, such loss would have fallen upon the appellants exclusively. It is true that, if the fishing expedition were a failure or if through insolvency or bankruptcy of the purchaser of the fish no money was realized by appellants, the members of the particular crew would receive nothing. In that sense, the crew would have sustained a loss. That, however, was simply a contingency affecting the payment of compensation for the services performed by them. Since they were to be paid only out of the earnings of the expedition, there was nothing owing to them until such earnings were received by the appellants. As to the deduction of certain expenses from the gross receipts before division of the balance into shares, that, too, was simply a method of determining the amount to be paid to members of the crews for their labor; it did not convert the arrangement into a joint adventure.

We turn now to the judicial decisions touching the subject. In *Domandich v. Doratich,* 165 Wash. 315, 5 P. (2d) 310, suit was brought to recover for personal injuries sustained by a fisherman who fell down a hatch on a fishing boat. One of the main questions involved was whether plaintiff's relation to the enterprise was that of an employee or that of a party to a joint adventure. On that question, this court said:

"Inquiry will first be directed to determine what the respondent's relation was to the enterprise, whether that of employee or a party to a joint adventure. The respondent was paid as compensation his proportionate share of the earnings of the boat, after deducting the operating expenses. He had a right to quit at any time, and was subject to being discharged by the master for cause. His contract of employment was entirely informal, and consisted of an inquiry to him as to whether 'you want to fish with me,' and his answer in the affirmative. All members of the crew were subject to the direction of the captain as to the work that

they should perform. The respondent was not required to share in the losses, if any.

"Two elements which are ordinarily present in a joint adventure are a 'close and even fiduciary relationship between the parties' and an agreement whereby the losses, if any, are to be shared. *State ex rel. Ratliffe v. Superior Court,* 108 Wash. 443, 184 Pac. 348. Neither of those elements is present in the case now before us."

A similar situation was presented in *Glaser v. Katlinich,* 169 Wash. 133, 13 P. (2d) 468, and the court there said:

"Our decision in *Domandich v. Doratich,* 165 Wash. 315, 5 P. (2d) 310, also comes near answering the second of these arguments. The only difference we see in the facts is that the plaintiff seaman in that case 'was not required to share in the losses, if any,' while this plaintiff seaman was to share in losses in so far as the proceeds of the catch failed to equal the expense incurred for oil for the engine and food for the crew. This does suggest a more nearly complete, conventional joint adventure between the plaintiff and the others, including the owner and the captain, than is suggested by the facts of that case.

"But we are to remember that whatever may be said as to this being a joint venture, the fact remains that it was not a joint venture as to the control of the prosecution of the venture in so far as the plaintiff and the other seamen were concerned. None of them had any voice in the control as to where the fishing would be done, as to the labor they were to perform, or even as to the manner of the performance of their labor. All of this was subject to the orders of the captain, which each seaman was bound to obey. While they were to be paid, prospectively, from the profits of the season's catch, with a bare possibility of having to bear some actual loss, they were none the less without voice or control in the actual prosecution of the venture. They were still mere seamen subject to the orders of the captain to the same extent as if they had been employed at a fixed wage, payable regardless of the profits of the venture."

We have quoted from these decisions so extensively in order to show their striking similarity to the case at bar in point of fact. They are controlling of the instant case. Our answer, then, to the first question to be herein determined is that appellants were employers having in their

employment the various members of the crews, within the meaning of the unemployment compensation act.

The remaining question is whether the services of the crew members fall without the operation of the act by reason of the exception tests specified in Rem. Supp. 1945, § 9998-154, or the occupational exclusions named in Rem. Supp. 1945, §§ 9998-155 to 9998-166.

There is no contention by the appellants that either the exception tests or the exclusionary provisions apply, and it is clear from the evidence that they do not. Those sections therefore require no further consideration.

The judgment is affirmed.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.

December 17, 1947. Petition for rehearing denied.