TO BE PUBLISHED IN OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

OPINION

of

JOHN K. VAN DE KAMP
Attorney General

CLAYTON P. ROCHE
Deputy Attorney General

:
:
:
:
:
:
:
:
:
:
:
:

No. 90-701

<u>JANUARY 3, 1991</u>

---

THE BOARD OF GOVERNORS OF THE CALIFORNIA COMMUNITY COLLEGES has requested an opinion on the following questions:

1. When the Board of Governors of the California Community Colleges distributes funds to community college districts for student matriculation services, are such distributions subject to approval by the Department of General Services?

2. May the Board of Governors of the California Community Colleges distribute funds to community college districts by grants without approval by the Department of General Services, where the primary purpose of the funding is to assist the community college districts?

CONCLUSIONS

1. When the Board of Governors of the California Community Colleges distributes funds to community college districts for student matriculation services, such distributions are not subject to approval by the Department of General Services.

2. The Board of Governors of the California Community Colleges may distribute funds to community college districts by grants without approval by the Department of General Services, where the primary purpose of the funding is to assist the community college districts.

ANALYSIS

The Board of Governors of the California Community Colleges ("Board") is established as a unit of state government by section 71000 of the Education Code.[1]  The Board is vested with numerous duties with respect to community colleges including such matters as

---

[1]All section references are to the Education Code unless otherwise specified.

developing and implementing "a comprehensive community college education and fiscal accountability system" (§ 71020.5) and exercising "the duties, powers, purposes, responsibilities, and jurisdiction heretofore vested in the State Board of Education, Superintendent of Public Instruction, the Department of Education, and the Director of Education with respect to the management, administration, and control of the community colleges" (§ 71024).

Community colleges themselves are not a part of state government, but are established within individual community college districts, which are governed by their own governing boards. (§ 72000 et seq.) This request for our opinion relates to the distribution of funds by the Board to individual community college districts for certain purposes, and whether the terms and conditions relating to these distributions are "contracts" which fall within the requirements of the Public Contract Code, section 10100 et seq., relating to contracts made by state agencies. We will discuss the distributions first and then relate these to the provisions of the Public Contract Code.

The first type of distribution at issue herein is that made pursuant to the Seymour-Campbell Matriculation Act of 1986 (§ 78210 et seq.; "Act"). The Act is operative when state funds are specifically appropriated for its purposes. (§ 78218.) The Chancellor of the Community Colleges, who is the chief executive officer of the Board (§ 71090), is required to implement its provisions in as many community colleges in the state as appropriated funds will permit. (§ 78211.5.) The main thrust of the Act is to optimize the opportunities for success of students enrolled in the community colleges. (§ 78211.) This will be done through the provision of "matriculation services" by the colleges to their students. There services include such matters as processing admission applications, orientation, counseling, identification of student aptitudes, evaluation of study and learning skills, reference to specialized support services (e.g., financial assistance) and post enrollment evaluation of each student's progress. (§ 78212.)

In return for the state funding, participating colleges are required to provide matching funds in an amount established by the Chancellor. (§ 78216.) Also, "[a]ll participating districts shall, with the assistance of the chancellor, establish and maintain institutional research to evaluate the effectiveness of the matriculation services described by [the Act] . . . and of programs and services designed to remedy students' skills deficiencies, using certain criteria for a data base for such research." (§ 78214.) Additionally, each participating college must "develop a plan for student matriculation that reflects all" of enumerated specified matters, such as a plan for actively providing the "matriculation services" and "the development and training of staff and faculty to implement" such services. (§ 78216.) Finally, the Chancellor is required to prepare reports for the Legislature with respect to the effectiveness of the program, including progress reports and his recommendation. (§ 78217.)

The second type of distribution at issue herein is nonspecific. We are informed that the primary purpose of the funding will be to assist the districts. We are not given any facts as to what the districts will "agree" to do in return for such funds. We assume that it would be at most to provide a plan for the use of and an accounting for such funds. We also assume that such distributions are otherwise permitted by law.

We turn now to the Public Contract Code and section 10100 et seq. relating to the making of contracts by state agencies. There are four basic forms of contracts covered by these sections: (1) construction contracts (i.e. for the erection, construction, alteration, repair and improvement of public projects) governed by the State Contract Act, sections 10100-10285.5 of the Public Contract Code; (2) procurement contracts, governed by sections 10295-10298 of the code; (3) contracts for services, governed by sections 10335-10354 of the code; and (4) consulting service contracts governed by sections 10355-10382 of the code.

As to the two types of distributions under consideration herein, those for student matriculation services and those to assist the community college districts generally, the first and last types of contracts (construction contracts and consulting contracts) are not germane herein.

As to procurement contracts, section 10295 delineates the types of contracts covered by sections 10295-10298 of the Public Contract Code. As pertinent herein, section 10295 states:

"All contracts entered into by any state agency for (a) the hiring or purchase of equipment, supplies, materials, or elementary school textbooks, (b) services, whether or not the services involve the furnishing or use of equipment, materials or supplies or are performed by an independent contractor, (c) the construction, alteration, improvement, repair or maintenance of property, real or personal, or (d) the performance of work or services by the state agency for or in cooperation with any person, or public body, are void unless and until approved by the department [of General Services]. Every such contract shall be transmitted with all papers, estimates, and recommendations concerning it to the department and, if approved by the department, shall be effective from the date of the approval. This section shall apply to any state agency which by general or specific statute is expressly or impliedly authorized to enter into transactions referred to herein."

The key requirement of the statute is that the "contracts" specified therein must be approved by the Department of General Services ("Department").

Sections 10335-10354 of the Public Contract Code contain detailed, supplemental provisions governing contracts for services (see § 10295, subd. (b)) and provide that "[t]he provisions of this article shall apply to all contracts entered into by any state agency for services to be rendered to the state whether or not the same involves the furnishing or use of equipment, materials or supplies or are performed by an independent contractor." This is the same language as found in subdivision (b) of section 10295 of the Public Contract Code. Thus we may direct and limit our analysis to the latter statute.

Prior to the establishment of the Public Contract Code, the provisions of its section 10295, quoted above, were essentially set forth in section 14780 of the Government Code. This office rendered two opinions with regard to whether certain grants or contracts were governed by that section. Our analysis was essentially the same in both opinions. Likewise we believe the analysis in those opinions is equally applicable herein.

Thus in 58 Ops.Cal.Atty.Gen. 586 (1975) we were asked whether grants by the Office of Criminal Justice Planning ("OCJP") to local government and state and private agencies fell within the purview of section 14780 of the Government Code. These grants were made for a "wide variety of programs and projects generally relating to law enforcement and the prevention of crime." (*Id*, at p. 587.) The grantees agreed to use the grants for proper purposes and to follow certain accounting procedures, record keeping, and submit quarterly reports to OCJP. Upon these facts, we concluded that only subdivision (b) of section 14780 was even potentially applicable (i.e., contracts for services). As to subdivision (b), we stated:

"Subdivision (b) refers to contracts entered into by a state agency (OCJP) for `services.' According to its common definition, the term `services' extends to any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed. *Skrivanich* v. *Davis*, 186 P.2d 364, 370 (1947) (Supreme Ct. Wash.,), rehearing den. 1947; *Creameries of America* v. *Industrial Commission,* 102 P.2d 300, 304 (1940) (Supreme Ct. Utah).

"Generally, the OCJP grant itself, gives funds to an entity to conduct a described law enforcement project. This is not akin to the standard contractual setting wherein a state agency contracts for the purpose of rendering services to or receiving services from the other party to the agreement (i.e., maintenance contracts, consultant contracts). Rather, we are aware of no criteria that the performance of the project must be for the benefit of OCJP as a party to the grant award documents." (*Id.* at p. 590.)

With respect to whether the quarterly reports could be considered to be "services" rendered to OCJP, we stated:

"It would seem that these reports would be principally used by OCJP to audit the grant project. . . . if they are used for evaluation studies, such would appear to be a by-product of the main purpose of the grant documents, which is to provide funds for the accomplishment of a specified project, a project which in general will not entail the rendition of services to the grantor, OCJP." (*Id.* at 591.)

We thus concluded overall:

"Essentially, it is believed that the foregoing discussion relating to section 14780 and OCJP grants points out the distinction between `procurement' contracts by the state, and `assistance' to others through grants. The former fall within the purview of section 14780, and the latter do not. Accordingly, it is concluded that the grant award documents used by OCJP in disbursing federal grant funds to entities as grantees do not come within any of the four types of contracts described in subdivisions (a) through (d) of Government Code section 14780. Therefore, the requirement that such documents be approved by the Department of General Services is not applicable to the grant award documents." (*Ibid.*)

In 63 Ops.Cal.Atty.Gen. 290 (1980) we were presented with an analogous situation. In that opinion we concluded that certain grants made by the California Department of Aging pursuant to federal law did not fall within the scope of section 14780 of the Government Code, using virtually the same reasoning as we did in our opinion on the OCJP. We additionally noted:

"The Department is authorized to (Welf. & Inst. Code, § 9308) and, in fact, does receive federal money under the provisions of the federal act (45 C.F.R. § 74.1 et seq.). The Department is a conduit of these funds which it may grant to qualified entities, individuals or groups. (Welf. & Inst. Code, §§ 9314, 9412, 9503.) The grants are made to further the purposes of the grantee, not the Department, subject to the powers of the Department to provide administrative assistance relating to the programs for which it funnels funds. The Department received no consideration from the grantee pursuant to the grant documents." (*Id.*, at p. 292; emphasis added.)

Accordingly, in both of our prior opinions, we concluded that if the purpose of the grant or contract was to provide assistance to another entity in the performance of its services to others and with no reciprocal return of goods or services benefiting the state, it did not fall within the provisions of section 14780 of the Government Code. The same reasoning would apply to the contracts and grants at issue herein with respect to student matriculation services and general assistance to community college districts. The purpose of the funds here is to provide supplemental assistance to the districts in the performances of their services to others, not for the return of goods or services to the state itself. (See § 78216, subd. (a) ["The Legislature recognizes that community college districts are currently funding various components of student matriculation through existing

counseling, assessment, and other student services, but that adequate student matriculation cannot be realized without supplemental funding support"].)  Whatever planning, accounting, and evaluation "services" would be rendered to the Board by the districts would not give rise to the application of the Public Contract Code requirements.  (See 58 Ops.Cal.Atty.Gen., *supra*, at 591.)

Based upon the reasoning of our prior opinions, we conclude that (1) the Board may distribute funds to community college districts for student matriculation services without the approval of the Department of General Services, and (2) the Board may distribute funds to community college districts by grants for general assistance without the approval of the Department of General Services.

\* \* \* \*