[No. 274-40741-1.    Division One.    April 27, 1970.]
Panel 1

JAMES DAN KNISELY, *Respondent,* v. BURKE CONCRETE AcCESSORIES, INC., *Appellant.*

*MacDonald, Hoague & Bayless* and *Wm. H. Neukom,* for appellant.

*Olwell, Boyle & Hattrup* and *Lee Olwell,* for respondent.

SWANSON, J.—James Dan Knisely, a professional engineer specializing in wire-handling machinery, contracted to design and construct a machine capable of automatically transferring snap ties between work stations. Burke Concrete Accessories, Inc., hereinafter referred to as "Burke," agreed to pay $12,500 to Knisely for manufacturing the machine, plus a royalty on each snap tie unit produced by the Knisely machine. Knisely claimed that Burke breached the royalty agreement, and sought damages. Burke counterclaimed for breach of contract and breach of warranty. Knisely was awarded $15,811.85 for past due contract payments, and $41,803.28 for future damages. Burke appeals.

Appellant Burke is a California corporation which manufactures, among other items, snap ties used in concrete construction. The ties are made in several steps by operations performed at various work stations. Burke consulted Knisely to devise a method to speed the manufacture of these devices. Knisely was to manufacture a machine capable of transferring the ties between points on the production line, incorporating adapted versions of the four separate machines previously used. The "transfer theory" was the thing of value. A prototype machine was installed in appellant's Seattle plant on April 3, 1964. Thereafter, on August 26, 1964, a contract for the purchase of this machine

was signed. Respondent Knisely covenanted "to construct a machine for the production of snap ties with an annual single eight (8) hour shift capacity of not less than two (2) million snap ties and which requires not more than two (2) operators in a forty (40) hour week." The contract further provided that Burke would purchase the machine on a cost of manufacture basis. After the purchase price was paid, Burke was obligated to pay royalties computed on a snap tie unit basis.

On January 6, 1965, Burke's manufacturing division manager, Edward S. Brugge, wrote Knisely a letter, exhibit 29,[1] accepting the machine and agreeing to start royalty payments as of November 11, 1964. Burke made the first payment in March, 1965. In December, 1965, the prototype machine was moved to Hayward, California, and a second machine was manufactured from Knisely's design by a third party. The use of this second machine commenced in Seattle in July of 1966. Just prior to this, on June 20, 1966, Burke stopped making royalty payments. On April 28, 1967, a member of Burke's board of directors wrote to Knisely's attorneys repudiating the contract in its entirety. Exhibit 50.[2]

---

[1]"In regard to your letter of December 30, 1964. So glad to hear you are on or ahead of schedule.

"In regard to the ½¢ per tie and starting with 11/11/64. This is satisfactory and to pay by calander [sic] quarters is satisfactory. This would mean that we should be making a payment effective now to include production to December 31, 1964. As soon as we have these figures from Jon this will be taken care of.

"My reason for asking you for the cost of various parts was not to check up on your cost, but rather to have a guide when purchasing our further requirements. Also I want you to understand with reference to Cads and Falcons that we want good reliable long working parts.

"Hope everything is going on schedule and continues."

[2]"Your letter of April 21 to W. J. Steffan and Mr. Knisely's letter of April 25 to W. J. Steffan have been referred to me for reply.

"I was consulted last September about Mr. Knisely's failure to produce the first machine required by the contract dated August 26, 1964, and about the damages caused to Burke Concrete by Knisely's lack of performance. I advised a meeting with Mr. Knisely to agree upon termination of the contract unless immediate performance could be obtained. At our request, Mr. Knisely tried to perform during the

Thereafter, Burke installed a machine of Knisely's design in Montebello, California. On May 15, 1967, Knisely commenced this lawsuit seeking recovery of the amount due under the contract, and for damages based on the repudiation of the contract. Judgment was entered for Knisely as indicated. Burke appeals and assigns error to 21 findings of fact.

First, appellant claims the contract between the parties was for the sale of machines expressly warranted as to annual production. This contention directly attacks the court's finding 29:

That the contract for the design and construction of the machine was in the nature of a joint venture and not a contract of sale which carried a warranty.

Burke alleges an express warranty is contained in paragraph 1 of the agreement:

month of October and failed. Since October 1966, Mr. Knisely has failed or refused to meet with officials of Burke to bring this matter to a final conclusion.

"This letter will serve to notify you and your client (1) that the contract dated August 26, 1964, is terminated for the reason, among others, that Mr. Knisely has failed to produce 'the first machine' that meets contract requirements, (2) that if your client persists in his claim against Burke we will be forced to commence suit against him for the damages suffered by reason of the costs Burke has unnecessarily incurred based upon representations by Mr. Knisely, and (3) that Mr. Knisely is free to discuss supplying equipment to other tie manufacturers so long as he realizes that Burke has supplied Mr. Knisely with trade secrets based upon an assumed confidential relationship arising out of the contract of August 26, 1964, and that Burke will hold Mr. Knisely legally liable for any disclosure of trade secrets obtained by reason of the confidential relationship.

"Burke Concrete has made some advances to Mr. Knisely calculated on a royalty basis, based upon his request for financial assistance and representations by Mr. Knisely that a first machine was produced pursuant to the contract. Those advances, made in 1965 and early 1966, will have to be the subject of discussion. After our accounting department has analyzed our entire relationship with Mr. Knisely to the extent we have a claim for a return of those advances, I will be in touch with you.

"If you and your client wish a meeting to discuss this matter, I would be happy to attempt to arrange such a meeting at our Hayward, California, plant to review the problems and the history of this situation."

*Manufacture of Machine* Knisely shall forthwith upon the execution hereof proceed to construct a machine for the production of snap ties with an annual single eight (8) hour shift capacity of not less than two (2) million snap ties and which requires not more than two (2) operators in a forty (40) hour week.

Claiming that an annual production of 2,000,000 snap ties was never reached, Burke says the warranty was breached, thus affording a power to repudiate the contract.

■ We agree with appellant's contention that this contract did not create a joint venture. The Washington rule on the requirements for a joint venture was definitively stated by Justice Steinert in *Carboneau v. Peterson,* 1 Wn.2d 347, 374, 95 P.2d 1043 (1939):

Briefly stated, a joint adventure arises out of, and must have its origin in, a contract, express or implied, in which the parties thereto agree to enter into an undertaking in the performance of which they have a common purpose and in the objects or purposes of which they have a community of interest, and, further, a contract in which each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in the performance. Thus, we note (1) a contract, (2) a common purpose, (3) a community of interest, (4) equal right to a voice, accompanied by an equal right of control.

Accord, *Korslund v. Troup,* 67 Wn.2d 773, 409 P.2d 856 (1966). Furthermore, in a joint business venture the parties share profits and losses. *Skrivanich v. Davis,* 29 Wn.2d 150, 186 P.2d 364 (1947). While the agreement here may in certain aspects resemble a joint venture arrangement, the essential element of shared profits and losses is missing. The primary purpose of the agreement is clearly stated in paragraph 3:

*Purchase of Machine* Upon satisfactory completion of the machine meeting the foregoing specifications, Burke shall purchase and Knisely shall sell the machine and the exclusive right to the use of the ideas, development and improvements involved therein, whether patentable, patented or otherwise.

Given this clause, the agreement here is a contract for the sale of goods as defined in RCW 63.04.020(1).[3] Such a contract may contain an express warranty as defined in RCW 63.04.130.[4] Acceptance of the goods does not, in the absence of agreement, discharge the seller's liability for breach of warranty. RCW 63.04.500.[5]

The question is, did paragraph 1 of the agreement constitute an express warranty? We assume arguendo that it did. Paragraph 1 of the agreement is an affirmation of fact—the machine will have an 8-hour shift capacity as specified. This affirmation was such as would induce Burke to purchase the machine. Was the machine accepted? RCW 63.04.490[6] defines acceptance, and finding 13 states that the machine was accepted by Burke. This finding is based on substantial evidence, exhibit 29, *supra*, and will not be disturbed. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The acceptance was made after a mutually agreed trial period. Finding 12. During the trial period Burke had ample opportunity to ascertain the warranted capacity of

[3]"A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price."

[4]"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."

[5]"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor."

[6]"The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

the machine. Substantial evidence shows that the specified capacity had been rendered. John Daub, manager of Burke's Seattle plant in 1964, testified that the prototype machine had a capacity to produce 2,000,000 snap ties per year with two operators working 8 hours a day, 5 days per week. Edward S. Brugge, Burke's manufacturing division manager, testified he felt that Knisely's fulfillment of the contract had been established.

We need only consider whether there was any agreement, express or implied, releasing Knisely from liability for breach of warranty. The evidence does not permit the finding of an express agreement releasing Knisely from liability; but must such an agreement be implied? In a letter to Knisely dated December 22, 1964, Edward Brugge stated:

> In our discussion we also established that you had approximately two days left to bring the Auto Tie machine into satisfactory operating shape. This was not to consider any extra "goodies" that might arise — that is until the header is completed, No additional modifying or improving of Auto Tie is to be considered. When a double header is completed and hung on the Auto Tie, then we should consider all modifications to make the machine better in all respects.
>
> . . .
>
> At this point I am wondering how many ties have been produced to date, what should be considered a proving period. When this has been established, we should start paying this amount. Let me hear from you in this regard so it can be set up as soon as possible.

■ Knisely responded to this letter, and Brugge in turn accepted the machine in the letter of January 6, 1965, *supra*. The juxtaposition of these letters demonstrates that on January 6, 1965, the Auto Tie was in "satisfactory operating shape," and that no additional "modifying or improving" was necessary to bring the machine into shape. From the acceptance, one can only conclude that the Auto Tie machine was performing as warranted and that Burke would not look to Knisely for breach of warranty liability.

There was an implied-in-fact agreement as defined in *Ross v. Raymer*, 32 Wn.2d 128, 137, 201 P.2d 129 (1948):

> A true implied contract, or contract implied in fact, is an agreement which depends for its existence on some act or conduct of the party sought to be charged, and arises by inference or implication from circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention on the part of the parties to contract with each other. [Citations.]

Moreover, this result is compelled by the terms of the contract. Paragraph 3, *supra,* shows that Burke was not obligated to purchase the machine until it met the specifications. Acceptance with knowledge of such a condition further shows that Burke had no intention of holding Knisely liable for breach of warranty.

Second, appellant Burke argues that the warranted capacity of the machine was never substantially achieved. As indicated, the implied agreement in the acceptance freed Knisely of any liability for breach of warranty. Moreover, the machine which Knisely contracted to produce was a transferring mechanism. Burke concedes in its brief that the mechanism operated at the warranted capacity: "[I]t has been recorded operating at 28-38 cycles per minute . . . which, if sustained over a 40-hour week for 50 weeks, would exceed the contract minimum."

▇▇ Third, Burke contends there was no evidence on which the court could base finding 40,[7] since the action was brought on the contract. Reference to quantum meruit is erroneous and also superfluous. The decision is properly supported by the evidence relating to the contract:

> A superior court decree which is based on an erroneous ground will be affirmed on appeal if there is an alternate ground presented by the pleadings and the record which supports the decree.

---

[7] "That defendant's cross-complaint must be dismissed because plaintiff substantially fulfilled his contract, and in any event is entitled to recover on a quantum mer[u]it basis, and the defendant has failed to prove any breach of warranty or damages attributable to the plaintiff."

*Northern Pac. Ry. v. State Util. & Transp. Comm'n,* 68 Wn.2d 915, 924, 416 P.2d 337 (1966); *Northwest Collectors, Inc. v. Enders,* 74 Wn.2d 585, 446 P.2d 200 (1968).

Fourth, Burke argues that the award of future damages under a second cause of action was erroneous,

> because there is absolutely no basis upon which that court could have found (a) that there would be future damages and (b) the extent of such future damages.

The rationale of this argument is that there is no contractual requirement that Burke use the machine. This fact, it is claimed, makes Knisely's sole remedy the repurchase of the machine as per the contract. In the alternative, Burke argues that the doctrine of anticipatory breach is *not* applicable to a unilateral contract or a bilateral contract which has become unilateral, where the contract calls for the payment of money in installment. From the finding that Knisely had substantially performed his duties, Burke argues that the contract was unilateral.

At first glance, these arguments are appealing, but closer analysis reveals their deficiencies. This case was not decided on a theory of anticipatory repudiation. Rather, the court found on substantial evidence that the contract was not severable. Finding 32.[8] Nor was the contract unilateral. Knisely had delivered an Auto Tie mechanism, but he was also obligated to assist Burke in patent protection and to help in the construction of other machines.

■ When properly viewed, the respondent Knisely's second cause of action was for the damages attributable to a present breach and repudiation. The theory of such cause of action is often confused with anticipatory breach. See 17 Am. Jur. 2d *Contracts,* § 448 (1964). The distinction is recognized in Washington:

> The theory which permits a plaintiff to sue immediately in a case of this kind is sometimes said to be antici-

---

[8]"That Exhibit 10 is not a severable contract and that even if severable the only portion which could be severed would be the design and construction of the machine, from the sale of and payment for the machine and that in any event the sale and payment part of the contract is not severable."

patory breach. But strictly speaking, the action is for a *present breach, seeking recovery for future damages.* This true basis for the action is stated with unusual clarity in 5 Williston on Contracts 3714, § 1317, as follows:

"Again, it is often thought that to allow a plaintiff to sue and recover full damages after some performance by the defendant has become due, but before the time for the completion of all his performance is to allow the doctrine of *anticipatory breach, yet this is not the case. As soon as a party to a contract breaks any promise he has made, he is liable to an action.* In such an action the plaintiff will recover whatever damages the breach has caused. . . . if the breach is serious or is accompanied by repudiation of the whole contract, it may and frequently will involve as a consequence that all the rest of the contract will not be carried out. This may be a necessary consequence of the situation of affairs or it may result simply from the plaintiff's right to decline to let the defendant continue performance, since even if all the remaining performances were properly rendered, the plaintiff would not get substantially what he bargained for. The plaintiff is entitled to damages which will compensate him for all the consequences which naturally follow the breach, and, therefore, to damages for the loss of the entire contract. This is no different in principle from allowing a plaintiff in an action of tort for personal injuries to recover the damages he will probably suffer in the future. *If the cause of action has accrued, the fact that the damages or all of them have not yet been suffered is no bar in any form of action to the recovery of damages estimated on the basis of full compensation.*"

(Italics ours.) *McFerran v. Heroux,* 44 Wn.2d 631, 640, 269 P.2d 815 (1954).

Thus, Knisely is entitled to the damages which will compensate him for the loss of the entire contract which, of course, includes future damages. Future damages, however, will not be allowed where there is no reasonable basis on which to conclude they will occur. There was no contractual obligation that Burke use the Auto Tie machine. Nor did the trial court specifically find that Burke would con-

tinue to use the Knisely machines. Rather, finding 24 states:

> That the defendant expects to continue making snapties at the same rate as during the past two years.

This finding is not sufficient to support an award of future damages. A finding that the rate of production will continue does not indicate that Burke will use the Knisely machines. Indeed, there is evidence that Burke intended to replace the Knisely machines. We agree with Burke that the award of future damages is not supported by the evidence or the findings. The award is stricken.

■ Although we cannot affirm this portion of the judgment, that is not to say that damages may not have accrued since the date of trial. The contract between Burke and Knisely provided for royalties over a 6-year period after the purchase price has been paid. If Burke has used the machines since the trial, Knisely will be entitled to his royalties.

Since the trial court will have jurisdiction over these parties upon remand, we think justice would be feebly served by having Knisely commence a suit for royalties accrued and thereafter, each quarter, until the end of the 6-year period. Unique cases should receive imaginative remedies. Pursuant to CAROA 16, we direct further proceedings be had in this case.

Upon remand, testimony should be taken to determine if Burke has used the Knisely machines during the time not covered by the prior judgment. If such use is found, royalties must be awarded. If time still remains under the agreement, the efficient administration of justice would best be served by requiring Burke to render periodic accountings of snap tie production on the Knisely machines. Commensurate royalties should then be awarded throughout the remainder of the contract period.

The judgment is affirmed in part and reversed in part, and remanded for further proceedings.

JAMES, C. J., and FARRIS, J., concur.

---

Petition for rehearing denied June 30, 1970.