[No. 1521-2. Division Two. May 18, 1976.]

C. GALE GLEASON, ET AL, *Respondents*, v. METROPOLITAN MORTGAGE COMPANY, ET AL, *Appellants*.

*James M. Martin, Landon & Martin, James E. O'Hern, Evan E. Inslee,* and *Inslee, Best, Chapin & Doezie, P.S.,* for appellants.

*Harold T. Hartinger* and *Kane, Vandeberg & Hartinger,* for respondents.

REED, J.—In June 1970, plaintiffs C. Gale Gleason and Leonard Zink brought suit in Pierce County Superior Court against defendants J. D. Hone and Dorothy H. Hone, his wife, and Metropolitan Mortgage Company, seeking to establish a joint venture or partnership in the Ambassador House apartments located near Tacoma, Washington and for an accounting of the profits derived from their operation and sale. After a preliminary hearing the Honorable Bartlett Rummel determined on June 20, 1972, that the parties were joint venturers, and an accounting was ordered. The second, or accounting phase of the proceeding,

took place before the Honorable John Cochran, who made additional findings of fact and conclusions of law and granted plaintiffs judgment in the sum of $93,445.96 on June 20, 1974. Defendants appeal from the judgments entered in both hearings, and Dorothy Hone separately appeals to the extent either judgment purports to impose liability on her as a former member of the marital community. We resolve all issues against the appellants and affirm.

During the latter part of 1964 Gleason and Donald Hays,[1] real estate brokers, and Zink, a real estate promoter and developer, joined in an attempt to procure new mortgage financing for the financially troubled 106-unit apartment complex known as Alpine Meadows which, together with the smaller Mall Apartments, was owned by Alpine Development Company. Hoping to gain a promised loan fee of $30,000, plaintiffs invested substantial funds in their procurement efforts, even to the extent of borrowing money and lending it to Alpine's owners. In April 1965, plaintiffs approached J. D. Hone, a mortgage broker and sole owner of Metropolitan Mortgage Company, a Washington corporation, the holder of a third mortgage for approximately $109,000 on the Alpine Meadows, with a proposal that Hone loan plaintiffs $33,250 to be used as a "good-faith" deposit for a Kansas firm's loan commitment of $950,000. Hone agreed to advance $35,000, the difference of $1,750 to be applied on interest owed Metropolitan by Alpine. The loan was evidenced by a promissory note and secured by an assignment of Gleason's seller's interest in a real estate contract known as the "Ray-Mar" contract. The Kansas loan did not materialize but plaintiffs invested the $33,250 in further endeavors on behalf of Alpine. By August of 1965 all efforts to assist Alpine ceased, leaving plaintiffs holding unsecured claims of approximately $43,000 against its owners.

In August 1965, plaintiffs again approached Hone to dis-

---

[1] Donald Hays, et ux., assigned their interests to plaintiffs in February 1968; they were merely nominal defendants, no relief being sought against them.

cuss their mutual interests in salvaging money from an operation that was by now in receivership. Hone's mortgage was subject to a first mortgage to Connecticut Mutual Life Insurance Company of approximately $525,000, a second mortgage to Continental Incorporated, of approximately $100,000 and disputed materialmen's liens of $20,400. The second mortgage was in process of foreclosure and Hone was considering purchasing the apartments at the impending sheriff's sale, as there appeared to be a substantial equity despite the many claims. At this time Alpine had been delinquent on Hone's mortgage since September 1963, owed $18,500 to Hone on a mortgage on the Mall Apartments and approximately $6,000 for loan fees, penalty interest, and "late charges" on both mortgages. Hone testified he usually charged only one percent over his cost in making loans, looking to loan fees for his profit. Hone carried an established credit line at the Bank of California in Seattle. The parties discussed how their combined efforts might salvage their respective investments in the property and in Alpine's owners and possibly net a profit, and apparently came to some sort of understanding.

As a result of the August meeting, the $35,000 Gleason note was replaced by a $50,000 note signed by plaintiffs, reciting that their liability was limited to $33,250 and interest. The note was to be used as security by Hone to raise $15,300 at the Bank of California to purchase the lien claims at a discount. This new note was also secured by an assignment of Gleason's interest in the Ray-Mar contract and called for payments of $500 per month.[2]

Pursuant to the oral understanding the parties had reached, Hone, financed by Bank of California, in whose name title was taken, purchased the apartment house and its furnishings at sheriff's sale for $104,000. The name was changed to the "Ambassador House," Gleason moved in immediately and the plaintiffs embarked on a program of

---

[2]Gleason made these payments from the monthly payments he received on the contract; by January 1968 he had reduced the balance of principal and interest on the $55,000 note ($33,250) to $23,481.57.

active management, painting, refurbishing, making additions and improvements, upgrading tenants and otherwise working to improve the complex and increase its occupancy rate, rental receipts and overall worth. It is undisputed these efforts were directed to an eventual sale of the complex, at which time all parties would first recoup what each had "invested" in the project and then share equally in the balance. The argument between the parties is as to the amount each had coming before division of any profit and whether that profit was to include rental receipts or was to be limited to net sale proceeds.

While Gleason invested all his energies and time to actual management of the complex, Hays and Zink devoted the majority of their time to efforts to procure either refinancing or a purchaser. From the outset plaintiffs and Hone met every Thursday in Tacoma to review and discuss the undertaking. They agreed that rental receipts were to be placed in a special account requiring the signature of Hone and one of the plaintiffs. Thereafter rental receipts were used to service the first mortgage debt, pay Gleason a resident manager's fee, pay maintenance and operation costs of the complex, pay a quarterly "dividend" of $100 to each participant and discharge personal debts incurred by plaintiffs for additions and improvements to the complex. When the property was eventually sold, after payment of these items, there remained from rental payments the sum of $47,730. The parties operated in this fashion until September 29, 1966, at which time they met and signed an agreement prepared by Hone's attorney.[3] No schedules were

---

[3] The agreement read in relevant part as follows:

"THIS AGREEMENT, made this date by and between Metropolitan Mortgage Company, a Washington corporation, hereafter called Metropolitan, and Leonard A. Zink, C. Gale Gleason and Donald Hays, hereafter referred to as Hays.

"WHEREAS Metropolitan is the owner of that certain 106-unit apartment house located in Tacoma, Washington, together with all personal property and chattels located thereon and commonly known as the Ambassador or Alpine Meadows, . . .

"WHEREAS Hays, dba under various assumed names, have contributed substantially to the physical operation of said apartment enter-

then or subsequently attached to the agreement as recited, although both parties later produced schedules which they claimed were those referred to.

The enterprise continued as before the written agreement and finally bore fruit when the Ambassador House was sold in October 1967 to Frank Holert for $1,137,550,

---

prise, in that they have managed the apartment, supervised the collection of rents, painted and cleaned the units in order to ready them for occupancy, and have received no compensation for these services rendered.

"WHEREAS Metropolitan has invested substantial sums of money and incurred substantial obligations in the acquisition of the real and physical assets of the Ambassador.

"WHEREAS Hays has previously invested a substantial sum of money in the former principals of the Ambassador, a schedule of said sums is attached hereto and incorporated herein by reference.

"Now, therefore, for good and valuable consideration, it is agreed as follows:

"1. That Hays will continue to manage said apartment in the same manner as it has been managed by Hays since November 19, 1965.

"2. All parties to this agreement will cooperate in obtaining a purchaser for said apartment or satisfactory refinancing of said apartment.

"3. Hays agrees that in the event the sale is placed through an affiliated company, that there will be no commission or fees charged for the sale or for the obtaining of said financing. Hays further agrees that if any of his affiliated companies receive a sales commission by reason of a rebate, that said commission rebate will not be charged or the funds received thereby will be reinvested for distribution in further accordance with this agreement.

"4. The net proceeds of said sale or refinancing will be divided as follows:

"a. First to the payment of all funds advanced by Metropolitan, including its attorney's fees, costs and other advances, in accordance with the schedule that is attached hereto and incorporated herein by this reference.

"b. To Hays, in accordance with the schedule attached hereto and incorporated herein by this reference.

"c. The balance of said proceeds, if any, shall be divided equally between Metropolitan and Hays.

"DATED this 29th day of September, 1966.

> "Metropolitan Mortgage Company
> By J. D. Hone,
> President
> s/Leonard A. Zink
> s/C. Gale Gleason
> s/Donald Hays"

leaving approximately $530,000 for distribution after costs of sale and the assumption by Holert of the first mortgage balance. Closing of the sale was deferred until January 1968 to enable Hone to liquidate Metropolitan in order to save taxes. During the interim the parties specifically agreed to continue operating the complex "as if owned" by the purchaser, resulting in an additional "gain" for division of approximately $8,000. The sale was closed January 15, 1968, by an independent escrow agent who disbursed the funds remaining as follows: (1) $252,824.27 to Hone as principal and interest on Ambassador House and Mall Apartments, (2) $19,907.99 to discharge a Tacoma bank debt of plaintiffs,[4] (3) $63,434.19 cash to Hone and (4) $193,800 to Hone in the form of a promissory note from Holert.

While awaiting the final closing, Hone and his accountant met with Hays alone and later with Gleason and Zink, to discuss whether the sale ought to be closed and to project, if possible, a "net profit." Hone, using his own figures, projected a profit for division of approximately $103,000 after repayment of the parties' respective claims as provided in the agreement of September 29, 1966. During these discussions plaintiffs' unsecured claims against Alpine's owners were rounded off to $45,000, and plaintiffs agreed to accept $47,000 in the form of a reissued promissory note from Holert which they subsequently received and discounted for cash. This supposedly reimbursed plaintiffs in full and represented their share of the anticipated "profit" of $51,750. During these talks plaintiffs did not particularly question the figures on Hone's "worksheet" as they were financially strapped and anxious for distribution. Plaintiffs also testified they were more concerned with whether the Holert sale would produce a profit and ought to be closed than they were with the adjustments between them and Hone. After further adjustments were made for the pay-

---

[4]The trial court determined this item was not properly chargeable to the venture and credited it against sums owing to plaintiffs in arriving at its final judgment.

ment of Hone's legal fees and income tax, plaintiffs agreed to pay half of any additional tax later determined to be owing.

Some two years later, after an IRS audit, Hone requested $3,900 from plaintiffs for additional taxes. This prompted plaintiffs to request an accounting and, not being satisfied with the information furnished by Hone, they brought this suit. The accounting trial before Judge Cochran revealed that Hone had taken for his own account the excess rentals of $47,730 and that he had charged the venture with sums he had invested in the Mall Apartments, with loan fees, penalty interest and late charges on his loans in connection with the Ambassador House, and with the full amount of the $33,250 loan with interest. By adjusting these and other items, the trial court arrived at the final judgment figure of $67,431 plus interest from January 15, 1968, to June 20, 1974, in the sum of $26,014.

Judge Rummel concluded in the first hearing that Hones were husband and wife, that Metropolitan was J. D. Hone's alter ego and that plaintiffs were entitled to an accounting from both Hones and Metropolitan from October 1967 to January 15, 1968. Judge Cochran later expanded the accounting period to cover all transactions between the parties from 1965 to 1968 and denied motions by Dorothy Hone to vacate Judge Rummel's order insofar as it purported to bind her as a former member of the marital community. It is from these determinations that Dorothy Hone appeals and we will first address ourselves to her appeal.

J. D. and Dorothy Hone separated in May 1969, J. D. Hone taking up residence at Issaquah, Washington in a home he had built for himself and a woman described as his paramour; J. D. Hone saw his wife and two children only infrequently, although he paid all expenses in connection with the family home and monthly support for his wife and children. Summons and complaint in the accounting suit were served on all defendants by leaving them with Dorothy Hone at the family residence in Seattle, Washington on May 27, 1970, and she immediately gave

them to J. D. Hone who caused his attorney to enter an appearance on behalf of all defendants. Dorothy Hone never discussed the accounting suit with the attorney nor in any other way did she specifically authorize him to appear on her behalf or represent her interests, although one of the defenses which he asserted on behalf of the marital community was that liability, if any, was limited to the corporate debt of Metropolitan Mortgage Company. In January 1970 J. D. Hone submitted in writing a proposed property settlement agreement which Dorothy Hone promptly took to her present attorney for advice. In January 1971 Dorothy Hone commenced an action for divorce in King County Superior Court which culminated in a final decree and property division in November 1972. Dorothy Hone also provided her own attorney with copies of the complaint and summons in the accounting suit, and he advised her not to appear because the papers asserted no personal liability against her, but only against Metropolitan.

Dorothy Hone's contentions are (1) she was not before the court, having personally made no appearance in the suit, and she had no notice she might be exposed to liability because the plaintiffs were seeking relief only from Metropolitan; and (2) J. D. Hone had no authority to represent her or her interests. Judge Cochran concluded, in dismissing Dorothy Hone's motion to vacate Judge Rummel's determination, that J. D. Hone had both statutory and actual (implied) authority to defend for the marital community and that his conduct of that defense did not constitute a fraud upon either Dorothy Hone or the community.

■ Dorothy Hone's first contention is without merit. The summons and complaint named as defendants "Metropolitan Mortgage Company and J. D. Hone and Dorothy H. Hone, his wife." Even though the prayer asked for an accounting from and a judgment against only Metropolitan, the complaint also stated *inter alia*

[t]he exact amount due to the plaintiffs from defendants J. D. Hone, Dorothy H. Hone, and Metropolitan Mortgage Company cannot be ascertained without an accounting. Defendants J. D. Hone, Dorothy H. Hone, and

the Metropolitan Mortgage Company at all times had and now have in *their* possession and under *their* control all money, accounts, records, property etc., relating to the foregoing matters.

(Italics ours.) And further

no further distribution has been made to the plaintiffs from cash in the sum of $63,434.94 and other property of the value of $193,800, more or less, received as the proceeds of the sale of the Alpine Meadows apartments by J. D. Hone, Dorothy H. Hone and Metropolitan Mortgage Company.

Additionally, Dorothy Hone was vice-president of Metropolitan and knew it was really J. D. Hone doing business in corporate form; she also knew of the association with plaintiffs in the Ambassador House venture, had personally visited the complex on occasion, and her 18-year-old son was employed there for a time. We think these facts were more than sufficient to put Dorothy Hone on notice she faced a potential liability on plaintiffs' claims and she erred at her own peril in electing not to participate in further proceedings.

The nature of a claim for relief is determined by the facts alleged in the complaint and as adduced thereunder, and by the relief requested.

*Silver Surprize, Inc. v. Sunshine Mining Co.*, 74 Wn.2d 519, 522, 445 P.2d 334 (1968).

■ Dorothy Hone's next argument concedes that, under the community property laws of this state in existence at the time plaintiffs' action was commenced, J. D. Hone was the statutory agent of the marital community and as such would ordinarily have been authorized to defend on its behalf, RCW 26.16.030,[5] but she argues that his authority

---

[5]Prior to its amendment RCW 26.16.030 read in part:

"The husband shall have the management and control of community personal property, with a like power of disposition as he has of his separate personal property, . . ."

As amended by Laws of 1972, Ex. Sess., ch. 108, § 3, effective May 20, 1972, either spouse, subject to certain exceptions, may manage and control community property and as stated in RCW 26.16.030 (6) reads:

"(6) Neither spouse shall acquire, purchase, sell, convey, or encum-

ceased when he abandoned his family, took up with another woman and reduced the Hone marriage to a "mere shell." We do not agree. It is not only the husband's right but his duty to defend actions against the marital community. *LaFramboise v. Schmidt*, 42 Wn.2d 198, 254 P.2d 485 (1953). It is true that a husband's actions may work to terminate this agency where he has deserted his family and they are living separate and apart so as to render the marriage one in name only. *Wampler v. Beinert*, 125 Wash. 494, 216 P. 855 (1923). But, however grievous the husband's acts may be in their effect upon the wife and the integrity of the marriage, they must also involve a disloyalty to or a fraud upon the community business interests before they serve to terminate the husband's agency. *Dizard & Getty v. Damson*, 63 Wn.2d 526, 387 P.2d 964 (1964). In the instant case, as stated in *Dizard* at page 530:

> There was no showing that the benefit from appellant's performance was diverted from the community to his own or his paramour's benefit. Nor was there a showing that the community was deprived of its assets, . . .

On the contrary, the evidence showed that J. D. Hone vigorously defended against plaintiffs' claims, that his interests and those of the marital community were so inextricably bound up together that any effort to insulate himself would necessarily tend to insulate the community, and that he sought to protect the community by contending for corporate liability only. Judge Cochran made a specific fact finding that

> the interests of Mr. and Mrs. Hone's marital community were well represented. That representation was not a fraud on Mrs. Hone who would not have been able to add one iota to what her husband presented during the trial before Judge Rummel.

---

ber the assets, including real estate, or the good will of a business where both spouses participate in its management without the consent of the other: *Provided*, That where only one spouse participates in such management the participating spouse may, in the ordinary course of such business, acquire, purchase, sell, convey or encumber the assets, including real estate, or the good will of the business without the consent of the nonparticipating spouse."

We think it clear that a delinquent husband's statutory agency terminates only with respect to the results flowing from the specific acts which work to produce the injury to the marital community. J. D. Hone's relationship with another woman and even the diversion of community funds to her benefit are in nowise connected with his actions in defending against the Ambassador House claim.[6] The fraud or disloyalty must be found in that defense. *Wampler v. Beinert, supra.*

Judge Cochran further found that J. D. Hone had *actual*, though implied, authority to represent the marital community in the Ambassador House suit. Again, the evidence amply supports the conclusion that Dorothy Hone permitted J. D. Hone to continue, as before the separation, in the sole management and operation of the community business affairs, and in particular in the defense of this lawsuit. Having been put on notice that plaintiffs' claims arose out of the conduct of a community enterprise and that she and the marital community were named as defendants, she could not stand by, allow the suit to progress, await the results, and now be heard to say she did not impliedly authorize that representation. *Dizard & Getty v. Damson, supra; cf. Colagrossi v. Hendrickson,* 50 Wn.2d 266, 310 P.2d 1072 (1957); *Lucci v. Lucci,* 2 Wn.2d 624, 99 P.2d 393 (1940); *Fielding v. Ketler,* 86 Wash. 194, 149 P. 667 (1915). Judge Cochran's findings are, therefore, based upon substantial evidence and his conclusions are in accord with the law; this assignment, too, is without merit.

We turn now to the appeal of all defendants from the judgments establishing (1) the existence of a joint venture and duty to account, and (2) that defendants had not fully accounted in accordance with the agreement of the parties and owed plaintiffs $93,445.96.

It is not surprising this enterprise finally resulted in litigation; despite the fact the participants were all expe-

---

[6]From the record we cannot determine in whose name title to the Issaquah property was taken. It was awarded to J. D. Hone in the divorce proceeding, however.

rienced and able businessmen, they opted to pursue a complicated course of financial dealings under a classic example of a "loose arrangement." The written agreement finally executed in September 1966 was extremely ambiguous, with or without the missing schedules. Judge Rummel was thus faced with probing for the intent of the parties in order to ascertain the true nature of their undertaking. *Nicholson v. Kilbury*, 83 Wash. 196, 145 P. 189 (1915). We think his determination that the parties entered upon a joint venture is founded on substantial evidence. The essential ingredients of a joint venture are (1) a contract, express or implied; (2) a common purpose; (3) a community of interest; and (4) an equal right to a voice accompanied by an equal right to control. *Refrigeration Eng'r Co. v. McKay*, 4 Wn. App. 963, 973, 486 P.2d 304 (1971); *Carboneau v. Peterson*, 1 Wn.2d 347, 95 P.2d 1043 (1939); 46 Am. Jur. 2d *Joint Venture* §§ 1, 12 (1969). From our examination of the record we have determined that all of these elements were present in the instant case. That the parties contracted is not disputed, nor that they had a community of interest and a common purpose, *i.e.*, salvaging what each had invested in the Ambassador House or its former owners, and the realization of a profit through acquisition, development, and improvement of the complex for eventual sale.

Defendants contend the elements of an equal right to a voice in management accompanied by an equal right to control are absent because (1) plaintiffs had no ownership or proprietary interest in the property, (2) the parties had not specifically agreed to share losses, and (3) none of the parties reported the transaction on his federal income tax return as a joint venture or partnership, nor was a separate partnership return filed. These arguments are not persuasive.

An ownership or proprietary interest in the subject matter of the enterprise by all parties is not essential to creation of a joint venture, nor must there be such an interest in order to find the element of a right to an equal

voice in its management and an equal right to control its instrumentalities. *Cf. Nicholson v. Kilbury, supra;* 46 Am. Jur. 2d *Joint Venture* § 12, *supra.* Conversely, finding the existence of the right to an equal voice and the right to equal control may lead to a conclusion, first, that a joint venture does indeed exist, and secondly, that the parties having that right under the agreement *also* have a proprietary interest in the subject matter or property of the venture in addition to a share in profits. *Washington Pulp & Paper Co. v. Robinson,* 153 Wash. 683, 280 P. 68 (1929); 46 Am. Jur. 2d *Joint Venture* §§ 12, 40, *supra.*

So, in the instant case it matters not that "title" was taken in the name of Bank of California at the sheriff's sale, and passed through Metropolitan to Holert by means of the certificates of redemption, or that the contract of September 1966 recites that Metropolitan was the "owner." What does matter is that substantial evidence supports the trial court's finding that plaintiffs had an equal right with Hone to a voice or vote in directing the affairs of the enterprise, and an equal right of control over the agencies and instrumentalities of the venture. That evidence may be summarized as follows: (1) the parties met weekly to discuss progress and agree upon a future course of action; (2) rentals were "impounded" and could be disbursed only if a member of each faction signed the check; (3) the parties prepared and disseminated "packages" to prospective purchasers or financiers, holding out "J. D. Hone and Associates" as the owners; (4) plaintiffs pledged their own credit in contracting for improvements which were afterwards paid for from rentals; (5) plaintiffs took court action to block efforts by the former owners to redeem; and (6) the agreement of September 29, 1966, provided "all parties to this agreement will cooperate in obtaining a purchaser for said apartment" which supports the conclusion neither side could dispose of the property without the other's consent. *Cf. Washington Pulp & Paper Co. v. Robinson, supra.* Nor is the fact that each venturer might have performed a different function because of his past training, experience,

and expertise fatal to a finding of a right to an equal voice and a right to equal control. *Refrigeration Eng'r Co. v. McKay, supra; Carboneau v. Peterson, supra*; 46 Am. Jur. 2d *Joint Venture* § 12, *supra*.

Defendants next urge that the absence of an express agreement by the parties to share losses precludes a finding of joint venture. We disagree because such an agreement may be implied, and "where the parties engage in a joint enterprise and there is an agreement to share profits, the law will presume that they agreed to share losses also." *Refrigeration Eng'r Co. v. McKay, supra; Stipcich v. Marinovich*, 13 Wn.2d 155, 124 P.2d 215 (1942); *cf. Eagle Star Ins. Co. v. Bean*, 134 F.2d 755 (9th Cir. 1943);[7] 46 Am. Jur. 2d *Joint Venture* § 13, *supra*.

Finally, on the issue of joint venture, the defendants argue that since the parties personally reported no partnership income as such and no tax return was filed for the venture, this is proof that the agreement was one between labor and management only. The trial court apparently attached little significance to these facts and it was within its fact finding province to assess their value. We note the offsetting factor that the parties specifically agreed

---

[7] The court in *Eagle Star Ins. Co. v. Bean*, 134 F.2d 755, 757 (9th Cir. 1943) ventures the opinion that:

In view of the careful consideration given by the Supreme Court of Washington to their prior cases, we believe it is no longer the law of Washington that there is no joint adventure unless the parties agree, expressly or impliedly, to share the losses, as was indicated in State ex rel. Ratliffe v. Superior Court, 108 Wash. 443, 451, 184 P. 348, and Gottlieb Bros. v. Culbertson's, 152 Wash. 205, 277 P. 447.

And in footnote 1, page 757:

Subsequent cases indicate no departure from the rule: Moen v. Zurich Gen. Accident, etc., Ins. Co., 3 Wash.2d 347, 101 P.2d 323; Manos v. James, 7 Wash.2d 695, 110 P.2d 887; Paulson v. McMillan, 8 Wash.2d 295, 111 P.2d 983; Edwards v. Washkuhn, 11 Wash.2d 425, 119 P.2d 905; Pence v. Berry, 13 Wash.2d 564, 125 P.2d 645.

If the *Eagle Star* court was correct, the later Washington cases appear to have reinstated the requirement that the parties agree either expressly or impliedly that losses be shared. *Refrigeration Eng'r Co. v. McKay*, 4 Wn. App. 963, 486 P.2d 304 (1971); *Knisely v. Burke Concrete Accessories, Inc.*, 2 Wn. App. 533, 468 P.2d 717 (1970); *Skrivanich v. Davis*, 29 Wn.2d 150, 186 P.2d 364 (1947).

to share in Hone's tax liability arising from the sale and were charged with that item.

Having determined that the Ambassador House enterprise was a joint venture, it was proper for the trial court to order an accounting. Joint venturers, like partners, owe to each other undivided loyalty and stand in the position of fiduciaries in all matters pertaining to the venture. *Harm v. Boatman*, 128 Wash. 202, 222 P. 478 (1924); *State ex rel. Ratliffe v. Superior Court*, 108 Wash. 443, 184 P. 348 (1919); 46 Am. Jur. 2d *Joint Venture* § 50, *supra.*

> In accordance with the principles of good faith and confidence governing the relations of joint adventurers, a joint adventurer may not conceal his interest or profit from his coadventurer. . . . The failure of one of several joint adventurers in an enterprise looking to the purchase of property, to share with his coadventurers any interest gained by the venture after inducing the purchase by the coadventurer, is a breach of confidence and will entitle the coadventurer to have the adventurer receiving the benefits account to his associates in the enterprise.

*Harm v. Boatman, supra* at 208.

> "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate."

*Donaldson v. Greenwood*, 40 Wn.2d 238, 249, 242 P.2d 1038 (1952), quoting from Chief Justice Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1 (1928).

Defendants also challenge Judge Cochran's findings that the parties intended to divide all profits from the venture including the excess rental sums of $47,730.47, and that Hone improperly charged the venture with repayment of sums Hone had invested in the Mall Apartments and for

loan fees, penalty interest, and late charges on Metropolitan's mortgages. As we have said, the court was dealing with a "loose arrangement" and it had to pierce a rather complicated series of transactions and resolve conflicting testimony in order to ascertain the true intentions of the parties. Because the parties worked first under an oral agreement and then under an ambiguous written agreement, that intent had to be derived in most instances from the acts and conduct of the parties. *Nicholson v. Kilbury, supra*. Our examination of the record again reveals substantial evidence supporting the finding the parties did agree on a division of the rentals but did not agree on payment of either Mall Apartment expenses or Hone's loan fees, penalty interest, and late charges.[8] The Mall Apartments had no connection at all with the Ambassador House, and plaintiffs testified the other items were never discussed with Hone and they did not agree they could be charged to the venture.

Lastly, defendants contend plaintiffs' acceptance of the $47,000 Holert note constituted an accord and satisfaction, barring plaintiffs from asserting any further claims. Judge Rummel found that plaintiffs did not agree to accept the note in full settlement, that plaintiffs were not fully acquainted with the nature and extent of all items shown to them on Hone's worksheet and that Hone "did not render to his associates an accounting of the transactions such as would be required of one acting in good faith."[9] An accord and satisfaction is a separate contract and all the elements thereof must be proved by the one asserting such

[8] Judge Cochran charged the venture (allowed Hone) interest at the contract rate on sums advanced to Alpine Development on the mortgage, on loans from Bank of California to purchase at sheriff's sale and to purchase lien claims. He charged the venture (allowed plaintiffs) interest at the contract rate on sums borrowed from banks in order to assist Alpine. Loan fees, penalty, and late charges were not considered as "funds advanced" under the agreement of September 26, 1966.

[9] Judge Rummel may very well have been influenced by the admitted fact that Hone had not credited plaintiffs with payments on the $33,250 note and charged the venture with the face amount of lien claims of $20,400 which he had purchased for $15,300.

an agreement. *Kibler v. Frank L. Garrett & Sons, Inc.*, 73 Wn.2d 523, 439 P.2d 416 (1968); 1 Am. Jur. 2d *Accord and Satisfaction* § 15 *et seq.* (1962). Such an agreement may be either express or implied, *Evans v. Columbia Int'l Corp.*, 3 Wn. App. 955, 478 P.2d 785 (1970), but before the acceptance of a lesser sum than may be owed on a disputed or unliquidated account will give rise to an accord and satisfaction, the party contending for that result must prove there was a meeting of the minds and that both parties understood that such would be the result. *Ingram v. Sauset*, 121 Wash. 444, 209 P. 699, 34 A.L.R. 1031 (1922). Defendants in this case offered no convincing evidence that the Holert note was offered upon the condition and with the understanding that its acceptance would discharge all obligations and confirm all accounts, nor that it was accepted by plaintiffs with any such understanding.

 Even had defendants met this burden we hold that, on the facts and circumstances of this case, no implied accord and satisfaction could arise from a settlement of accounts between these parties. The relationship being one of joint venture, the funds remaining for division were held by Hone in trust for all participants. This is not the ordinary case of debtor settling with creditor; rather it is one of the fulfillment of the fiduciary's duty to account to his principal—a fellow joint venturer. In the absence of an express agreement, made upon full revelation, no accord and satisfaction will arise in such a case. *Cf. Thayer v. Harbican*, 70 Wash. 278, 126 P. 625 (1912); 1 Am. Jur. 2d *Accord and Satisfaction* § 17, *supra*; 6 A. Corbin, *Corbin on Contracts* § 1291 (1962); Annot. 80 A.L.R. 1056 (1932); *but see Hotel Randolph Co. v. John C. Watrous Co.*, 144 Wash. 215, 257 P. 629, 53 A.L.R. 766 (1927).

> The law will not suffer an agent to withhold moneys collected for a principal's account by the pressure of a threat that no part of the moneys will be remitted to the owner without the approval of deductions beneficial to the agent.

*Hudson v. Yonkers Fruit Co.,* 258 N.Y. 168, 173, 179 N.E. 373, 375, 80 A.L.R. 1052 (1932).

None of defendants' assignments of error having any merit, the judgments are affirmed.

PETRIE, C.J., and PEARSON, J., concur.

Petition for rehearing denied June 28, 1976.

Review denied by Supreme Court November 12, 1976.