**Kenneth N. NELSON,
Plaintiff-Appellant,**

v.

**O. E. SERWOLD and Helen Serwold, his
wife, Defendants-Appellees.**

**No. 79–4662.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1981.

Decided Feb. 1, 1982.

As Amended on Denial of Rehearing
Sept. 8, 1982.

William D. Cameron, Williams, Lanza, Kastner & Gibbs, Seattle, Wash., for plaintiff-appellant.

William A. Helsell, Seattle, Wash., for defendants-appellees.

Before SKOPIL and POOLE, Circuit Judges, and KENYON,* District Judge.

POOLE, Circuit Judge.

The district court found and another panel of this court affirmed that in 1965 O. E. Serwold had purchased from the Estate of Nels Nelson, the appellant's father, 36 shares of stock in violation of Section 10(b) of the Securities Exchange Act of 1934. The district court computed damages as the difference between the price paid and the fair market value of the stock within a reasonable time period thereafter. On appeal this court reversed the district court's limitation of damages to fair market value and instructed that where the purchaser's gain exceeds the seller's losses, disgorgement of the purchaser's profits is the proper measure of damages.

Pursuant to the appellate mandate the district court recomputed the damages. Due to a pooling agreement between Serwold and others, Serwold was the beneficial owner of only 30% of the stock he purchased from Nelson. The district court ordered a complete disgorgement of all profits received by Serwold only for the 10.8 shares for which he was the beneficial own-

* Honorable David V. Kenyon, United States District Judge, for the Central District of California, sitting by designation.

er. As to the 25.2 shares of which Serwold was not the beneficial owner of record the court applied the fair market value measure of damages, i.e., the difference between the price paid and the highest price attained by the stock within a reasonable period after the transaction. Kenneth Nelson appeals the district court's damage computation claiming it is inconsistent with the mandate of this court. He also seeks review of the denial of his request for attorneys' fees.

As the facts are set out at length in this court's opinion in *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978) they will only be briefly summarized here.

Kenneth Nelson, the appellant, inherited a one-third interest in 36 shares of Pouslbo Rural Telephone Association (PRTA) from his father's estate along with his sister Gladys, and brother Herbert, both of whom subsequently assigned their interest to Kenneth. In 1962 inquiries were made to O. E. Serwold, the appellee, then president of PRTA as to the status of the stock. Paul Coie, Serwold's attorney and personal friend responded by stating that upon proof of ownership the appellant would receive $5.00/share. A counteroffer of $6.94/share was made by Earl Korth, the attorney acting on behalf of the Nelson estate, and accepted by Coie in late 1965. In 1965 the actual book value of the stock, determined by dividing the stockholder's equity (the net worth of the corporation) by the number of issued and outstanding shares (7,123), was approximately $60.00/share. The record does not reflect any purchases of PRTA stock other than by Serwold from 1965–1969.

At the time of the purchase Serwold was record owner of 56% of PRTA. This was the result of a stock pooling agreement made between the Serwolds, the Iversens, William Gee and Coie in 1956 as part of a plan to modernize the company and increase its marketability. The members of the group agreed to pool their funds to purchase sufficient PRTA stock to attain majority control. Serwold was to be record owner of all stock purchased, including any held by members of the group prior to the institution of the agreement. Beneficial ownership of the stock was divided as follows:

| | | |
|---|---|---|
| Iverson | – | 30% |
| Serwold | – | 30% |
| Gee | – | 30% |
| Coie | – | 10% |

As early as 1965 Serwold began to receive inquiries from persons interested in purchasing PRTA and negotiations with United Utilities, Inc. (United) began in December of 1970. On May 20, 1971 Serwold transferred to Iverson, Gee and Coie record ownership of their respective shares. In January of 1972 United purchased PRTA. Each shareholder received 25 shares of United stock for each share of PRTA stock, making each PRTA share worth $500. The book value of the PRTA stock was $163/share.

Nelson learned of the pending sale to United in December of 1971 and brought this suit in June of 1972 against Serwold and his wife Helen who had also been a director of PRTA. He charged a violation of Section 10(b) of the Securities Act and of Rule 10b–5 of the Securities and Exchange Commission. A pendent state claim for violation of Washington securities laws RCWA §§ 21.20.010, 21.20.430 and 21.20.900 was also alleged.

## I. DAMAGES

█ Section 28 of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) (1971 & Supp.1979), provides that any person bringing a suit under any of the provisions of that chapter may not recover "a total amount in excess of his actual damages on account of the act complained of." The Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), ruled that the measure of damages under this section is the difference between the fair value of that which the seller received and what he would have received absent the fraudulent conduct. *Id.* at 155, 92 S.Ct. at 1473. However, the court determined that a different measure of damages ought to apply where the fraudulent purchaser derives more than

the seller's actual losses. Under these circumstances the seller is entitled to recover an amount equal to the purchaser's profits. *Id.* at 155, 92 S.Ct. at 1473; *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965).

This appears a proper case in which to apply the exception since appellant's losses, $53.06 per share ($60—$6.94), are substantially less than the appellee's profits, $493.06 per share ($500—$6.94). The issue before us is whether Serwold should personally be held liable to disgorge the profits accrued on the sale of all 36 shares of PRTA stock to United even though he was beneficial owner only of 10.8 shares at the time of that sale. Appellant argues that Serwold should be held liable under any of the following theories: restitution; the principle of agency; and/or the rules governing liability for a partnership or joint venture.

### A. *Restitution*

■■■ The purpose of restitution is twofold: (1) to restore the defrauded party to the position he would have had absent the fraud, Restatement of Restitution § 1, Comments a, b, c, and d (1937); (2) and to deny the fraudulent party any benefits, whether or not forseeable, which derive from his wrongful act. *Id.* § 1 Comment e, § 151 Comment c; *Janigan, supra* at 786. Thus, where a person with knowledge of the facts wrongfully disposes of or acquires property of another and makes a profit thereby he is accountable for those profits. *Id.* § 1 Comment e, § 151 Comment f. When the property is of fluctuating value, such as stock, the injured party may be awarded an amount equal to the highest value reached by the stock within a reasonable time after the tortious act. *Id.* § 151 Comment c; *Myzel v. Fields*, 386 F.2d 718, 744 n.23, 745 (8th Cir. 1967).

Here Serwold, as record owner, distributed all the PRTA stock to the members of the control group according to their entitlement under the 1956 agreement prior to the sale to United.[1] Except for his own shares, he received no compensation for the transfer. Once this transfer was complete the Serwolds could no longer make restitution by returning to appellant that portion of the stock which was not theirs to return, and at most could be held liable for its monetary equivalent. But we agree with the district court however that the Serwolds should not be made to disgorge the profit from the sale of the stock owned by other members of the control group because they did not benefit from that profit. Appellant argues that they did receive a benefit in that the stock helped in attaining majority control of the company. This is inaccurate because majority shareholder status had been achieved in 1959, before the sale and the group had ceased efforts to acquire more PRTA stock as of that year.

On these facts no gain of substance by Serwold existed sufficient to warrant liability under a restitution theory for the profits earned by the others. To rule otherwise would change the character of restitution from an equitable remedy, designed to compensate for the wrong committed, to a penalty as the wrongdoer would be forced to pay windfall profits which did not accrue to his benefit. *See, Baumel v. Rosen*, 412 F.2d 571, 576 (4th Cir. 1969). We decline making such a rule especially where, as here, the district court found that appellee's conduct was not willful or deliberate. We note further that at oral argument counsel for appellant conceded that he had learned about the control group during pretrial discovery but, as a tactical decision, decided not to join the remaining members of the control group as co-defendants, thus waiving his opportunity to litigate that group's liability.

1. Appellant argues that the district court's finding that the 36 shares were distributed pursuant to the 1956 agreement is contradicted by the fact that PRTA stock certificate # 809 (representing 44 shares of PRTA stock including the 36 shares in question), was transferred to Rudy Iverson. This contention is without merit since it is not disputed that the shares held by Serwold were distributed in accordance with the 1956 agreement under which each member received his percentage of the 36 shares.

### B. Agency

Appellant next contends that Serwold should repay the profits on the sale of all 36 shares on the theory that he was an agent for undisclosed principals (the control group) in purchasing the shares in 1965, and as such was a controlling person against whom liability should be fixed. We disagree.

Agency is the fiduciary relation which results from the joint manifestation of consent by one person that another shall act on his behalf and subject to his control, and of consent by that other so to act. *Grace Line, Inc. v. Todd Shipyard Corp.*, 500 F.2d 361 (9th Cir. 1974); Restatement of Agency 2d § 1(1) (1958). The agent acts for or on behalf of the principal and subject to his control, and his acts are those of the principal. *N. L. R. B. v. United Brotherhood of Carpenters*, 531 F.2d 424 (9th Cir. 1976).

This does not appear to be the relationship between Serwold and the others. While the characterization given their relationship by the parties is not controlling it is a factor to be considered. Coie testified that the group merely provided funds for the stock purchases and had no other involvement with Serwold and the Company's management. Both Coie and Serwold compared the relationship to that of a trust. It is settled law that a trustee may hold legal or equitable title to property for a beneficiary without becoming an agent of the beneficiary. Restatement of Agency 2d § 14B Comment a; Restatement of Trusts 2d § 8. He is an agent only if he agrees to hold title for the benefit and subject to the control of another. *United Brotherhood of Carpenters, supra* at 426. In the absence of any evidence of authority by the other parties to direct, restrain or otherwise control the action of Serwold, we conclude that no agency relationship existed. *Id.* at 427.

### C. Partnership or Joint Venture

Finally, appellant argues that Serwold was a member of a partnership or joint venture and as such can be held liable for the wrongdoings of the partnership.

Partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." Business includes "every trade, occupation or profession." Uniform Partnership Act §§ 2, 6; RCWA §§ 25.04.060, 25.04.020. The control group would be classified as "owners" only in the most technical sense, i.e., because of their status as shareholder. The pooling of funds to purchase stock without more does not qualify as a trade, occupation, or profession.

Appellant contends that the sharing of profits by the group is *prima facie* evidence of the formation of a partnership. However, this argument assumes that the 30/30/30/10 stock distribution constituted profits. Here the group members had paid Serwold in 1956 to make future stock purchases on their behalf. He did so and they became the equitable owners at each purchase of stock which he held for them. That legal title was not transferred to the owners until 15 years later did not dissolve the trust relationship to turn it into a partnership and did not transform the stock purchase from an investment into business profits. While each member realized a substantial profit on the sale of PRTA to United those profits did not result from the carrying on of any business but rather derived from the natural accretions in value of an investment security.

Appellant's claim that a joint venture was formed also fails. The scope of a joint venture may be considerably narrower than that of a partnership and limited to the achievement of a single transaction or common purpose. *Refrigeration Engineering Co. v. McKay*, 4 Wash.App. 963, 486 P.2d 304 (1971). Whether a partnership or joint venture has been formed depends on the applicable state law. While the attainment of majority stock ownership could arguably be considered a common purpose, Washington law also requires that each contributor to the venture have some right to direct the conduct of the others and must agree that profits and losses will be shared. *Liebergesell v. Evans*, 23 Wash.App. 357,

597 P.2d 908 (1979), *rev'd on other grounds,* 93 Wash.2d 881, 613 P.2d 1170 (1980); *Refrigeration Engineering Co., supra; Knisely v. Burke Concrete Accessories, Inc.,* 2 Wash. App. 533, 468 P.2d 717 (1970). Neither of these latter conditions is satisfied in this case.

Because we find no theory under which Serwold can be held liable for the profits made by the other members on the sale of the PRTA stock, we affirm the district court's computation of damages which limited recovery to Serwold's own profits.[2]

## II. ATTORNEYS' FEES

■ Nelson contends that the district court erred in not awarding reasonable attorneys' fees authorized by RCWA § 21.20.430(2).[3]

After careful consideration of the applicable Washington case law, we conclude the district court correctly found that the enactment of RCWA § 21.20.430(2) in 1975 created a new statutory right of suit for defrauded sellers; that its attorney fee provisions are prospective only and do not apply to the subject transaction which took place in 1965.

In 1970 the Washington Court of Appeals, Division Two, held in *Shermer v. Baker,* 2 Wash.App. 845, 472 P.2d 589 (1970) that when a purchaser of securities violates the provisions of RCWA § 21.20.010 [4] (the Anti-Fraud Act), "any person" injured as a result of such violation has an action for damages. Thus, a defrauded seller had an implied cause of action under the holding of *Shermer.* By statute, only *purchasers* defrauded by means of "fraud or misrepresentation" had a private cause of action for damages in 1970. RCWA § 21.20.430(1) (Civil Liabilities Act).

Subsequently, in 1975 the Washington legislature amended the Civil Liability Act by adding subdivision (2) which gave a defrauded *seller* a right of action against any person who bought the security by means of "fraud or misrepresentation," including as part of damages the recovery of reasonable attorneys' fees. Two years later, in 1977, the Washington Court of Appeals, Division Two, overruled its earlier holding in *Shermer* that an implied cause of action existed for an injured seller under the Anti-Fraud Act finding that the legislature had deliberately refrained from providing to sellers an action for damages. *Ludwig v. Mutual Real Estate Investors,* 18 Wash.App. 33, 567 P.2d 658 (1977), *overruled on other grounds, Kittilson v. Ford,* 93 Wash.2d 223, 608 P.2d 264 (1980).

The *Ludwig* court made clear that the terms "fraud and misrepresentation" used in both Subdivisions (1) and (2) of the Civil Liabilities Act were not synonymous with the phrase "material omissions" contained in the Anti-Fraud Act. *Id.* at 661–662. Effective September 21, 1977, the Washington legislature amended subdivision (2) of the

---

**2.** Appellees concede the correctness of the district court's damage calculation, which includes, in addition to a complete disgorgement of all profits actually received by Serwold, a compensation to appellant for his entire loss as a result of the sale on the shares not owned beneficially by Serwold. We therefore do not address this issue.

**3.** RCWA § 21.20.430(2) (1978) provides:

(2) Any person who buys a security in violation of the provisions of RCW § 21.20.010 is liable to the person selling the security to him, who may sue either at law or in equity to recover the security, together with any income received on the security, upon tender of the consideration received, costs, and reasonable attorneys' fees, or if the security cannot be recovered, for damages. Damages are the value of the security when the buyer disposed of it, and any income received for the security, plus interest at eight percent per annum from the date of disposition, costs, and reasonable attorneys' fees.

**4.** RCWA § 21.20.010 provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(1) to employ any device, scheme, or artifice to defraud;

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Civil Liability Act to permit suit by a defrauded seller against any person selling a security in violation of the Anti-Fraud Act and deleted the reference to "fraud or misrepresentation."

From this history it can be discerned that prior to 1977 the Anti-Fraud Act and the Civil Liabilities Act were meant to address two distinct wrongs. *Ludwig, supra* at 661–663. Thus, even when an implied cause of action in favor of sellers was held to exist under *Shermer*, it applied only to violations committed through "fraud or misrepresentation" and not to omissions. Therefore, although Nelson correctly contends that material omissions were always unlawful under the Anti-Fraud Act, that Act did not provide redress for defrauded *sellers* until 1975 and then it was limited to those sellers whose stock had been obtained by "fraud or misrepresentation." The violation of which Nelson complains here, material omissions, did not become the basis of a civil damage suit until the 1977 amendment.

We thus conclude that the Washington legislature created a new statutory right for defrauded sellers in 1975. We now inquire whether that law has retroactive application.

A statute which creates a new right is deemed substantive and is applied prospectively unless its language evidences a legislative intent that it be applied retroactively. *United States v. Perry*, 431 F.2d 1020 (9th Cir. 1970); *Koster v. Warren*, 297 F.2d 418 (9th Cir. 1961); *Johnston v. Beneficial Management Corp. of America*, 85 Wash.2d 637, 538 P.2d 510 (1975). The district court found that the amendment was phrased in language of present and future tenses and therefore evidenced an intent that the amendments apply prospectively only. *Johnston, supra.*

Appellant cites *McClellan v. Sundholm*, 89 Wash.2d 527, 574 P.2d 371 (1978) and *Godfrey v. State of Washington*, 84 Wash.2d 959, 530 P.2d 630 (1975) as support for the position that the amendment should be applied retroactively. We find neither case persuasive and each is distinguishable on its facts. On the contrary, *Johnston* appears more factually similar to the instant case. In *Johnston* the plaintiff attempted to bring suit in 1973 under the Washington Consumer Protection Act. That Act, as originally enacted in 1961 made unlawful the conduct alleged in plaintiff's complaint but did not provide a private right of action. In 1970 the statute was amended to provide a civil cause of action. However, the incident involved had occurred in 1968. The court refused to apply the 1970 amendment to the 1968 incident stating that the amendment was substantive and that nothing in the language of the amendment evidenced any intent that it apply retroactively.

In *Godfrey, supra*, the Washington court made it very clear that retroactive application was limited to two general types of statutes: first are " * * * those which relate to practice, procedure or remedies and do not affect a contractual or vested right." Such " * * * procedural statutes usually apply to pending causes of action that do not affect contractual or vested rights or do not impose a penalty." *Id.* at 631. The other category given retroactivity are those "in which the legislature has indicated some intent [to have the statute apply retroactively] and which do not interfere with vested rights or impose a penalty." *Id.* at 633.

This case was not pending at the time of the 1975 amendment since it had been fully litigated and only the amount of damages to be awarded remained to be determined. The statute creates a new substantive entitlement, i.e., the award of attorneys' fees which was not available prior to the statute's enactment even under the brief duration of the implied cause of action. We therefore affirm the denial of attorney's fees.

The judgment of the District Court is AFFIRMED.