IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL J. LANG, individually, and as Personal Representative of the ESTATE OF FRANK E. COSTA, on behalf of the Estate and all statutory beneficiaries, | No. 86205-7-I |
| | DIVISION ONE |
| Respondent/Cross-Petitioner, | |
| v. | UNPUBLISHED OPINION |
| PLATINUM NINE HOLDINGS, LLC, a Washington Limited Liability Corporation, doing business as NORTHWEST AMBULANCE, a company; NORTHWEST AMBULANCE CRITICAL CARE TRANSPORT, a company, and XYZ, a fictitious entity or company, | |
| Petitioners/Cross-Respondents, | |
| and | |
| RUBATINO REFUSE REMOVAL, INC.; RUBATINO REFUSE REMOVAL, LLC, a Washington Limited Liability Corporation; RUBATINO REFUSE, LLC, a Washington Limited Liability Corporation; RUBATINO REFUSE REMOVAL HOLDINGS, LLC, a Washington Limited Liability Corporation; RUBATINO LITTER SOLUTIONS, INC., a Washington Corporation; RUBATINO HOLDING COMPANY, INC., a Washington Corporation; and RUBATINO | |

ENGINEERING, LLC, a Washington
Limited Liability Corporation; and XYZ
Corporation,

Defendants.

SMITH, J. — In 2020, an ambulance operated by Platinum Nine Holdings, LLC (NWA) crashed while transporting Frank Costa to the hospital. Costa died as a result. Costa's estate, through Michael Lang, sued NWA for negligence. NWA moved for summary judgment, claiming they were immune from liability under RCW 18.71.210. Lang also moved for summary judgment, contending RCW 18.71.210 was not relevant to the facts of the case and requesting dismissal. The court denied NWA's motion for summary judgment and granted Lang's motion in part.

After a trial, the jury ruled in Costa's favor and awarded Costa's estate 2.3 million dollars in noneconomic damages. After NWA submitted payment, they served Lang with notice of appeal. A dispute arose between the parties about NWA's ability to appeal. Lang moved to deny the appeal, contending an accord and satisfaction created a settlement agreement precluding either party's ability to appeal. The court denied the motion.

NWA appeals, asserting the trial court erred in granting Lang's summary judgment motion in part because the trial court misconstrued RCW 18.71.210. Lang cross-appeals, claiming the trial court erred in denying a motion to enforce the settlement agreement because the parties reached an accord and satisfaction.

Finding no error, we affirm.

FACTS

Background

In November 2020, Platinum Nine Holdings, LLC (NWA), picked up Frank Costa to transport him to the hospital for lab testing. NWA is a Washington limited liability company doing business as Northwest Ambulance. Costa was 78 years old and suffered from metastatic breast cancer. He resided at Genesis Care Center (Genesis) in Everett.

Genesis requested an ambulance transfer after concerning bloodwork. NWA employees Jack Wilson, Henry Shaw, and Kat Averill responded to the call.[1] The ambulance crew moved Costa from his bed to the ambulance stretcher and secured him with two lap belts and guardrails. NWA did not use shoulder straps to secure Costa to the gurney. Wilson later testified that shoulder straps were for "specific patients" who "weren't able to control their upper body;" that he had rarely seen anyone use shoulder straps; and that he could not recall being trained on how to use them.

During transport, Costa's condition deteriorated and Wilson called an emergency code. Shaw, driving the ambulance, turned on the lights and sirens. Driving in the left lane of Highway 526, the ambulance came up on a garbage truck. When the garbage truck started to move to the right, Shaw accelerated to pass on the left. But as the ambulance sped up, the garbage truck merged back

---

[1] Averill was in training at the time of this call.

left. Hitting the brakes, Shaw swerved to the right of the garbage truck, aiming for a shoulder to have more room to slow down. He did not see the highway divider to the right of the garbage truck. The ambulance hit the highway divider head-on at 53 miles per hour.

During the crash, Costa came off the gurney and hit the ambulance wall. He sustained injuries to his head and neck. Radioing for help, Shaw triaged Costa as "code red," meaning "you will die momentarily." Another ambulance transported Costa to the hospital and he died later that day of blunt force trauma.

<u>Summary Judgment Proceedings</u>

Michael Lang, as representative for Costa's estate, sued NWA for wrongful death. In his complaint, Lang alleged that NWA was negligent and that that negligence caused Costa's death. In its answer, NWA asserted that RCW 18.71.210 rendered it immune from liability. Both parties moved for summary judgment addressing NWA's claimed immunity.

NWA subsequently admitted negligence, stating that its employees failed to exercise ordinary care by not securing Costa to the gurney with all available straps and by not avoiding an accident. NWA further admitted that Costa suffered serious injuries as a result of that negligence, expressly stating that NWA's "negligence proximately caused Frank Costa's accident-related injuries and death." NWA maintained, however, that it was not grossly negligent and therefore still immune from liability under RCW 18.71.210.

NWA moved for summary judgment based on its claim that RCW 18.71.210 provides qualified immunity because NWA was a licensed ambulance service whose emergency medical technicians (EMTs) were performing emergency transport services at the time of the crash. NWA reiterated that it was not *grossly* negligent and that in operating the ambulance and stretcher, the EMTs were performing actual emergency medical procedures.

Lang's motion for partial summary judgment asserted that RCW 18.71.210 had no application to the facts at issue because NWA's failure to properly secure Costa was not part of any actual emergency medical procedure. Lang continued on to state that neither driving nor buckling seatbelts are medical procedures within any field of medical expertise. Lang also pointed out that the statute defined "emergency medical services" as distinct from transportation.

The trial court rejected NWA's interpretation of RCW 18.71.210 and ruled, as a matter of law, that "driving an ambulance is not emergency medical service." Determining that NWA was, thus, not immune from suit, the court granted Lang's motion for partial summary judgment and denied NWA's motion.

The issue of noneconomic damages continued to trial. And although NWA moved for revision, again asking for summary judgment on its immunity claim, the court did not hear the motion until after trial.

Motions in Limine

Lang moved *in limine* to exclude the testimony of Dr. Linda Ding from trial because NWA failed to disclose the nature and extent of its communications with Dr. Ding. Dr. Ding cared for Costa immediately following the crash.

When NWA provided a declaration stating that a paralegal at the firm representing NWA had repeatedly sent Dr. Ding copies of Costa's emergency room medical records, Lang argued that the behavior constituted impermissible *ex parte* communication. Lang further argued that the behavior resulted in prejudice because NWA gave Dr. Ding biased and incomplete information. The trial court denied Lang's motion.

Trial

At trial, NWA relied heavily on Dr. Ding's testimony. In opening arguments, NWA stated that Dr. Ding recommended a comfort-based approach to Costa's care based on illnesses and injuries unrelated to the crash. Dr. Ding then confirmed that she had no recollection of Costa outside the records NWA provided. Based on the records NWA provided, Dr. Ding testified to Costa's progressive decline. During closing statements, NWA claimed Dr. Ding essentially testified that "Costa was not likely to leave the hospital, even if he had arrived without incident."

Using NWA's proposed verdict form, the jury found the Costa estate suffered $2,300,000 in noneconomic damages. The NWA verdict form did not

differentiate between the negligent driving and the failure to use all available restraints.

Before entering judgment on the jury verdict, the trial court heard NWA's motion for revision concerning summary judgment. After oral argument, the court denied NWA's motion for revision. The trial court then entered judgment on the jury verdict.

<u>Post Judgment Payment</u>

Following the entry of judgment on the verdict, NWA provided Lang with a letter stating it included three checks, totaling $2,318,131.13, "in full satisfaction of the judgment entered on February 22, 2024." Signed by NWA's attorney, the letter also requested a satisfaction of judgment to be executed and filed.

Two of the three enclosed checks noted that they were for "full and final settlement for any and all claims." The third check stated it was for "Post Judgment Interest adjustment." And the proposed satisfaction of judgment form provided that the judgment had been fully satisfied.

In March 2022, Lang informed NWA that the checks sent did not cover all 27 days of interest owed on the judgment debt and therefore could not be deposited with the full and final settlement language. NWA responded that only 26 days were owed. Lang then deposited the checks that same day.

Once Lang deposited the checks, NWA served the estate with a notice of appeal. Lang contended that a settlement agreement, documented in the letter

and checks, did away with all potential appellate claims. NWA, expressing confusion, argued no such settlement agreement existed.

Lang contended that the language from the letter and checks, stating that they were in "full and final settlement of any and all claims" settled any appellate claim and pointed out that NWA's attorney signed the letter. Lang continued on to assert that the Costa estate gave up its right to the 27th day of interest in exchange for all parties giving up their appellate claims. NWA again disagreed, stating no such settlement agreement existed and that NWA only owed 26 days of interest. Lang then moved to enforce the settlement agreement.

The trial court refused to enforce a settlement agreement, concluding no meeting of the minds occurred and that the debt was undisputed. The trial court also ruled, however, that the judgment had not been satisfied because NWA owed Lang 27 days of interest.

Lang moved for reconsideration, noting the trial court found the judgment debt to be undisputed while simultaneously resolving a dispute over that debt. In the alternative, Lang requested that the court enter a direct entry of judgment on its decision denying enforcement of the settlement agreement. Requesting a response only on the latter issue, the trial court certified that its denial of the motion to enforce the settlement constituted a final order ripe for appeal.

ANALYSIS

Summary Judgment

NWA asserts that the trial court erred in granting Lang's motion for summary judgment and denying NWA's motion for summary judgment because the trial court misconstrued RCW 18.71.210. Because, under the facts of this case, RCW 18.71.210 does not extend qualified immunity to ambulance transportation or the use of gurney restraints, we conclude that the trial court acted appropriately in granting Lang's motion in part and denying NWA's motion.

We review a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We consider the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Keck*, 184 Wn.2d at 370. Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Civil Rule (CR) 56(c).

1. Qualified Immunity under RCW 18.71.210

NWA contends that the trial court misconstrued RCW 18.71.210 in denying its motion for summary judgment because ambulance transportation of patients receiving treatment and care to a medical facility is part of "emergency medical service" as a matter of law. Because the statute differentiates between emergency medical service and transportation, we disagree.

We review statutory interpretation de novo. *Thurman v. Cowles Co.*, 4 Wn.3d 291, 296, 562 P.3d 777 (2025). "The goal of statutory interpretation is to discern and implement the legislature's intent." *Thurman*, 4 Wn.3d at 296. In interpreting a statute, we look first to the plain language. *Thurman*, 4 Wn.3d at 296. This includes examining the plain language of the specific statutory provision, as well as the meaning of that language in the context of the whole statute and related statutes. *Thurman*, 4 Wn.3d at 296. We presume that the legislature did not intend absurd results. *Thurman*, 4 Wn.3d at 297.

To "promote the delivery of quality health care," the Washington legislature enacted Chapter 18.71 RCW to grant limited immunity for qualifying acts and omissions during emergency medical services. RCW 18.71.002.

RCW 18.71.210 provides:

(1) No act or omission of any physician's trained advanced emergency medical technician and paramedic, as defined in RCW 18.71.200, or any emergency medical technician or first responder, as defined in RCW 18.73.030, done or omitted in good faith while rendering emergency medical service under the responsible supervision and control of a licensed physician or an approved medical program director or delegate(s) to a person who has suffered illness or bodily injury shall impose any liability upon:

(a) [t]he physician's trained advanced emergency medical technician and paramedic, emergency medical technician, or first responder;

. . . [or]

(f) any licensed ambulance service.

. . .

(2) This section shall apply to an act or omission committed or omitted in the performance of the actual emergency medical procedures and not in the commission or omission of an act which is not within the field of medical expertise of the physician's trained advanced emergency medical technician and paramedic,

10

emergency medical technician, or first responder, as the case may be.

. . .

(4) This section shall apply also, as to the entities and personnel described in subsection (1) of this section, to any act or omission committed or omitted in good faith by such entities or personnel involved in the transport of patients to mental health facilities or chemical dependency programs, in accordance with applicable alternative facility procedures adopted under RCW 70.168.100.

Chapter 18.71 RCW does not define "emergency medical service," but instead incorporates the definition in Chapter 18.73 RCW. RCW 18.71.010(2). RCW 18.73.030(11) defines emergency medical services as "medical treatment and care which may be rendered at the scene of any medical emergency or while transporting any patient in an ambulance to an appropriate medical facility."

RCW 18.71.210 also references "emergency medical procedures" as distinct from "emergency medical service." Under the Washington Administrative Code (WAC), "emergency medical procedures" include only skills performed within the scope of EMS personnel's practice. WAC 246-976-010(33). RCW 18.71.210 does not provide immunity "in the commission or omission of an act which is not within the field of medical expertise of the [EMT]."

Former WAC 246-976-182 (2011), in effect during the trial proceedings below, then defines the scope of practice. Former WAC 246-976-182(1)(c) states, "[c]ertified EMS personnel are only authorized to provide patient care. . . [w]ithin the scope of care that is: (i) [i]ncluded in the approved instructional guidelines/curriculum for the individual's level of certification; or (ii) [i]ncluded in approved specialized training; and (iii) [i]ncluded in state approved county [medical program director] codes."

11

RCW 46.61.035(1) describes emergency transportation, separate from emergency medical services or procedures, stating "the driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section."

### a. Ambulance Transportation

NWA alleges that the legislature intended ambulance transportation to be an essential element of emergency medical services rather than a distinct act. But the plain language of the statute and its surrounding context indicate otherwise. As stated, RCW 18.71.210 provides immunity for any act or omission done or omitted in good faith "while rendering emergency medical service." And as defined by RCW 18.73.030(11), emergency medical service means medical treatment and care provided at the scene of a medical emergency "or while transporting" a patient in an ambulance. Because emergency medical service is an act that can be done "while transporting" a patient, it is a distinct act from the transporting itself. As a result, transportation alone does not constitute an "emergency medical service."

NWA references an Illinois statute, maintaining that this court should interpret RCW 18.71.210 similarly to the applicable case law. But the Illinois statute immunizes both emergency and non-emergency services. And the statute's definition of non-emergency services explicitly includes "the provision of

. . . any and all acts necessary" taken "before, after, or during transportation."[2] Because driving an ambulance is an act necessary during transportation, it is necessarily a non-emergency medical service under the Illinois statute.

In contrast here, RCW 18.71.210 provides qualified immunity only to those "rendering emergency medical service." It does not grant immunity for non-emergency services. And because RCW 18.73.030 differentiates transportation from an emergency medical service, the Washington statute does not provide similar immunity to the non-binding Illinois statute.

Additionally, driving an emergency vehicle does not constitute medical expertise and is therefore not immune under the statute. As shown by the language of RCW 46.61.035(1), ambulance drivers share emergency vehicle driving expertise with law enforcement officers and firefighters. But law enforcement officers and firefighters do not necessarily have any medical training. Therefore, driving an emergency vehicle within the privileges outlined by RCW 46.61.035 does not constitute medical expertise within the field of expertise of an EMT. And RCW 18.71.210 does not provide immunity for an act not within the field of expertise of an EMT.

We conclude that RCW 18.71.210 does not provide qualified immunity for ambulance transportation.

---

[2] 210 ILCS 50/3.10 (Illinois).

*b. Use of Gurney Restraints*

NWA next claims that EMTs' use of a gurney and gurney restraints is clearly an "emergency medical procedure" to which immunity applies. Lang asserts that we need not address this issue because NWA did not raise it below. We conclude that NWA did raise the issue but determine that NWA is not immune because, given the facts of this case, the use of shoulder straps does not fit into the scope of EMS practice.

Generally, a party may not raise an issue for the first time on appeal. RAP 2.5(a).

Here, Lang asserts that NWA did not argue below that the use of shoulder straps constitutes an emergency medical procedure as defined by RCW 18.71.210(2). Rather, NWA argued only that the failure to use all straps did not constitute gross negligence to overcome immunity. But both arguments, regardless of the specific wording, assert that NWA should be immune from liability in this case. As a result, NWA did raise the issue below and we continue on to address it.

NWA maintains, without authority, that licensed ambulance service crews are trained to use restraints and seat belts as part of their medical training. Because NWA provides no citation for this statement, we disregard this assertion; especially given NWA's EMT testimony. Wilson testified that he had no recollection of being trained to use the shoulder restraints and that he had rarely seen other EMTS use the shoulder restraints. RCW 18.71.210 (2)

provides that the statute shall not apply "in the commission or omission of an act which is not within the field of medical expertise of the. . . emergency medical technician or first responder," using "the" rather than "a" or "an" to modify the emergency provider.   Thus, the plain language indicates that the specific EMT's training is at issue, not an EMT in general.  Therefore, NWA's unsupported claim about how EMTs are usually trained is irrelevant.  The EMT at issue testified that he was not trained on how to use shoulder straps.  As a result, the use of shoulder straps under these facts is not an act within the field of medical expertise of the EMT.  Accordingly, the statute does not extend immunity in the present case.

2. Gross Negligence

NWA then asserts that the court erred in granting Lang's motion in part because Lang failed to plead or offer evidence of gross negligence by the ambulance crew.  But because the statute does not provide qualified immunity for the behavior at issue and NWA conceded negligence, Lang did not need to plead or offer evidence of gross negligence.

As noted above, RCW 18.71.210 does not provide qualified immunity for ambulance transportation or the use of gurney restraints.  Therefore, no immunity to overcome exists and a party need only plead negligence.  Because NWA conceded its negligence, the trial court acted appropriately in granting Lang's motion for summary judgment in part and denying NWA's motion.

CROSS APPEAL

Settlement Agreement

On cross-appeal, Lang alleges that the trial court erred in denying his motion to enforce the settlement agreement because the parties reached an accord and satisfaction as to that settlement agreement. Therefore, because the agreement precludes any further claims, this court should dismiss NWA's appeal. NWA maintains that the court did not err because no meeting of the minds occurred and the parties never signed or agreed to a binding settlement agreement as required by CR 2A. We agree with NWA.

We review a trial court's denial of a motion to enforce a settlement agreement de novo. *Lavigne v. Green*, 106 Wn. App. 12, 16, 23 P.3d 515 (2001).

An accord and satisfaction is a new contract, complete within itself. *Paopao v. Dep't of Soc. & Health Servs.*, 145 Wn. App 40, 46, 185 P.3d 640 (2008). The principle allows for parties to agree to "settle a claim by some performance different from that which is claimed due." *Pugh v. Evergreen Hosp. Med. Ctr.*, 177 Wn. App. 348, 358, 311 P.3d 1253 (2013). To do so, it requires "a bona fide dispute, an agreement to settle the dispute for a certain sum, and performance of the agreement." *Pugh*, 177 Wn. App. at 358. An accord and satisfaction also requires consideration. *Kibler v. Frank L. Garrett & Sons, Inc.*, 73 Wn.2d 523, 525, 439 P.2d 416 (1968).

When parties dispute the amount owed, a court may imply an accord and satisfaction from surrounding circumstances. *U.S. Bank Nat. Ass'n v. Whitney*, 119 Wn. App. 339, 351, 81 P.3d 135 (2003). For example, "if the amount of a debt is unliquidated or disputed, then the tender of a certain sum in full payment, followed by acceptance and retention of the amount tendered, establishes an accord and satisfaction." *Whitney*, 119 Wn. App. at 351. This does not apply, however, to amounts that are liquidated or certain and due. *Whitney*, 119 Wn. App. at 351. And "before the acceptance of a lesser sum than may be owed on a disputed account . . . will give rise to an accord and satisfaction, the party contending for that result must prove there was a meeting of the minds and that both parties understood that such would be the result." *Gleason v. Metropolitan Mortg. Co.*, 15 Wn. App. 481, 498, 551 P.2d 147 (1976).

CR 2A then further governs the enforcement of a settlement action. *Morris v. Maks*, 69 Wn. App. 865, 868, 850 P.2d 1357 (1993). CR 2A requires out of court agreements, such as an accord and satisfaction, to be both in writing and signed by the attorney for the party denying the agreement. As a result, CR 2A " 'precludes enforcement of a disputed settlement agreement not made in writing or put on the record, whether or not common law requirements are met.' " *In re Patterson*, 93 Wn. App. 579, 582-83, 969 P.2d 1106 (1999) (quoting *In re Marriage of Ferree*, 71 Wn. App. 35, 39-40, 856 P.2d 706 (1993)).

1. Accord and Satisfaction

Lang claims that the parties met all accord and satisfaction elements because the parties disputed the debt by disagreeing on the interest calculation, the release of all claims constituted additional consideration, there was a meeting of the minds between the parties, and Lang performed the agreement. NWA does not dispute the existence of a bona fide dispute or of Lang's performance. But NWA does maintain that no meeting of the minds occurred on the alleged "accord" to preclude any appeal. We conclude Lang fails to establish an accord and satisfaction because no "meeting of the minds" exists.

"An accord [and satisfaction] requires a 'meeting of the minds,' an intention on the part of both parties to create an accord and satisfaction as a matter of law." *Whitney*, 119 Wn. App. at 351 (quoting *Kibler*, 73 Wn.2d at 525). The creditor must understand that the money is tendered on the condition that its acceptance constitutes satisfaction. *Whitney*, 119 Wn. App. at 351. " 'The mere fact that the creditor receives less than the amount of [their] claim, with knowledge that the debtor claims to be indebted to [them] only to the extent of the payment made, does not necessarily establish an accord and satisfaction.' " *Whitney*, 119 Wn. App. at 351 (internal quotation marks omitted) (quoting *Kibler*, 73 Wn.2d at 527).

Here, Lang fails to establish a meeting of the minds that the money was offered only on condition of accord and satisfaction. In fact, the record is clear that NWA's intent in tendering the payments it made to Costa's estate was to

satisfy the judgment, rather than to propose a compromise. NWA and Lang did dispute the amount of interest owed. But as a result of that dispute, the letter included with the checks simply states NWA's intent to satisfy the judgment and stop post-judgment interest from accruing. The full and final satisfaction language that Lang references, both in the letter and on the checks, did not in and of itself create an agreement for Lang to accept less than the full amount of the judgment owed in exchange for NWA dismissing its right to appeal. And the mere fact that Lang received less than the amount he believed owed to him, knowing from NWA's correspondence that NWA believed it had paid the entirety owed, does not establish an accord and satisfaction.

NWA and Lang did not create an accord and satisfaction limiting NWA's ability to appeal.

### 2. CR 2A

Lastly, Lang claims that the purported settlement agreement satisfied CR 2A's requirements. We disagree.

CR 2A precludes enforcement of an alleged settlement agreement that is genuinely disputed. *In re Patterson*, 93 Wn. App. 579, 582-83, 969 P.2d 1106 (1999). A party moving to enforce a settlement agreement must prove "there is no genuine dispute over the existence and material terms of the agreement." *Brinkerhoff v. Campbell*, 99 Wn. App. 692, 696-97, 994 P.2d 911 (2000). We consider the record "in the light most favorable to the nonmoving party." *Brinkerhoff*, 99 Wn. App. 692 at 697.

19

Here, as noted above, the parties clearly dispute the existence and material terms of the agreement.  The parties did not agree to a binding settlement agreement under CR 2A limiting either party's ability to appeal.

We affirm.

_____

WE CONCUR:

_____          _____, ACJ